**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**A. Henry TAGER, Defendant-
Appellant.**

No. 72–1418.

United States Court of Appeals,
Tenth Circuit.

Argued Jan. 11, 1973.

Decided May 14, 1973.

Rehearing Denied Aug. 28, 1973.

John W. Brimer, Wichita, Kan., for defendant-appellant.

Kirby W. Patterson, Department of Justice, Washington, D. C. (Robert J. Roth, U. S. Atty., and Sidney M. Glazer, Department of Justice, on the brief), for plaintiff-appellee.

Before BREITENSTEIN, HILL and McWILLIAMS, Circuit Judges.

HILL, Circuit Judge.

Tager appeals from conviction and sentence by the United States District Court for the District of Kansas following guilty verdicts by a jury on three counts of an indictment. One count charged him with having conspired, in violation of 18 U.S.C. § 371, with a named co-defendant and two named but unindicted co-conspirators to transport in interstate commerce a United States treasury bill with a face amount of $100,000 knowing it to be stolen, in violation of 18 U.S.C. §§ 2314 and 2315. Counts 2 and 3 were substantive counts under the last two named statutes. Tager and the co-defendant, Konys, were tried jointly, and both were convicted.

The evidence on behalf of the prosecution established that David Casady, an unindicted co-conspirator, came to Las Vegas on February 6, 1970. He contacted Konys, who was at that time confined to a local hospital. Casady testified, after being granted immunity, that Konys had shown him the $100,000 treasury bill at the hospital. He testified that when Konys had produced the treasury bill, "he shook the bill like it might be one that would be a little hot to hold." From this Casady inferred there was a "stigma" attached to the bill. Konys requested that Casady attempt to obtain $25,000 against the bill. Casady then contacted an acquaintance in Las

Vegas, Boyd Rasmussen, the other unindicted co-conspirator, about obtaining this amount for the treasury bill.

The next morning Rasmussen, in trying to find someone willing to lend the requested amount with the treasury bill as collateral, called the office of a local businessman, Gilbert Barnes. Barnes declined to make the requested loan, but advised Rasmussen there was a person in his office who could perhaps be of some assistance. Rasmussen was then introduced to the appellant Tager, who was in Las Vegas pursuing business with Barnes. The telephone conversation was then conducted through an amplification device in Barnes' office. The details of the transaction as related to Tager were that Rasmussen was representing Casady who was attempting to borrow $25,000 to $30,000 on the bill. There was also discussed at this time a five to eight thousand dollar "finder's fee" which would be paid to the person locating a place where the loan could be obtained. Tager requested that he be allowed to see the treasury bill. It was agreed, and that afternoon Tager with four others, including Casady, drove to the hospital where Konys was confined. Casady entered the hospital and soon returned with the treasury bill which he showed to Tager and the other occupants of the car. After examining the bill, Tager stated that it looked genuine, to which Casady replied, "That's all that I can guarantee, is that it is authentic."

An agreement was reached whereby Tager would assist Casady in obtaining the loan at a Kansas City, Kansas, bank at which Tager had his personal banking accounts. At trial, conflicting explanations were offered as to the reason for handling the loan in the Kansas City bank. One explanation related an impossibility of securing that amount of funds from a Las Vegas bank, while another purported reason related to an attempted concealment of this asset pending a future divorce proceeding of one of the participants in the transaction.

Tager returned to Kansas City on Sunday, February 8, and was contacted the next day by Casady who had arrived in Kansas City that morning from California. Tager met Casady and the two of them proceeded to the bank. There is some evidence showing Tager suggested to the bank's officers that federal authorities be contacted for the purpose of establishing the genuineness of the bill. In any event, such an inquiry by bank officials revealed the treasury bill being presented by Tager to be part of a theft of treasury bills from a New York City bank approximately four months earlier.

Casady, who had left the bank when the federal authorities were called, was arrested down the street from the bank while waiting for a taxi to leave the area. Tager remained at the bank until the federal authorities arrived, and after being informed of and waiving his Fifth Amendment rights, stated that he had obtained the treasury bill while in Las Vegas the previous weekend; that he had been asked to obtain a $25,000 loan using the treasury bill as collateral; that he was to receive a $5,000 fee for doing so; and that when the requested loan was later increased to $30,000 he had increased the amount of his fee to $8,000. In other testimony Tager denied that his fee was to have been either $5,000 or $8,000, but that it was "twenty-five to thirty-five hundred" dollars.

The assistant manager of a Las Vegas branch bank testified during the trial that a loan could be obtained in Las Vegas using the treasury bill as collateral; that attorneys are not used in treasury bill transactions; and that the usual fee charged by the bank for handling an unmatured treasury bill would be from twenty to fifty dollars, with fifty dollars as the maximum.

While at the bank, Tager additionally told the agents the name of the Las Vegas hotel at which he was registered on that weekend. The registration records were produced at trial, together with testimony of the hotel's assistant

manager. These records bore no indication of Tager having been registered at the hotel.

Tager, after being advised of his rights, also testified before the grand jury that he had repeatedly stated that he was going to have the treasury bill verified as to its authenticity before he would have anything to do 'with the transaction. Rasmussen and Casady, however, testified that Tager had made no statements that he was going to contact federal authorities to verify the authenticity of the treasury bill.

■ Tager first asserts error in the trial court's denial of his motions pursuant to F.R.Crim.P. Rule 29 for judgment of acquittal, contending there was insufficient evidence to establish that he knew the treasury bill was stolen. In reviewing the district court's refusal to direct a verdict of acquittal, this court must determine whether, viewing the evidence in a light most favorable to the prosecution, there was substantial evidence, together with reasonable inferences drawn therefrom, that would sustain the verdict.[1] We have carefully read and considered all of the evidence in the record and must conclude that the trial court did not err in refusing to direct a verdict of acquittal. There was sufficient evidence to support the verdict of the jury.

■■ Tager next contends the trial court erred in permitting the introduction of evidence which was inconsistent with or contradictory to statements previously made by him. The alleged erroneously admitted evidence consisted of the hotel records indicating that he had not been registered at the hotel; the evidence showing a lack of necessity of taking the treasury bill to Kansas City to obtain funds on it; the inconsistent and contradictory statements made by

Tager regarding the amount of his fee in the transaction; and testimony that Tager had not made repeated declarations of his intent to have the bill authenticated by federal authorities. False exculpatory statements made by a defendant are admissible to prove consciousness of guilt and unlawful intent.[2] The evidence under attack here was properly admitted.

■ Appellant next argues the trial court prejudicially confined pre-trial discovery, particularly with regard to the testimony of other witnesses given to the grand jury. He contends the refusal of the trial court to order disclosure of the grand jury minutes denied him access to favorable information by which he could have both attacked the grand jury proceedings and better prepared for trial. Under the 1970 amendment to 18 U.S.C. § 3500, the defendant has no right to pre-trial discovery of statements made by government witnesses to the grand jury.[3] There was no error in refusing appellant's request for disclosure.

■ Complaint is also made that the 18-month delay between the date of the commission of the offense and the presentation of the evidence to the grand jury was a prejudicial delay. In United States v. Beitscher, 467 F.2d 269, 272 (10th Cir. 1972), we held "the rights of a defendant under the due process clause of the Fifth Amendment are not violated in the absence of a showing of actual prejudice resulting from the pre-indictment delay and that the delay was purposefully designed to gain tactical advantage or to harass the defendants." We do not believe either of these elements was present in this case.

■■ Tager next maintains the trial court erred in permitting the prosecution to question its own witnesses regarding prior inconsistent statements

---

1. United States v. Weiss, 431 F.2d 1402 (10th Cir. 1970).

2. United States v. Kilpatrick, 458 F.2d 864 (7th Cir. 1972) ; United States v. Pistante, 453 F.2d 412 (9th Cir. 1971).

3. United States v. Quintana, 457 F.2d 874 (10th Cir. 1972), cert. denied, 409 U.S. 877, 93 S.Ct. 128, 34 L.Ed.2d 130; 18 U.S.C. § 3500(a), (e)(3).

which they had given in testimony before the grand jury. Appellant contends this was improper in that the prosecution was permitted to impeach its own witnesses, while at the same time confusing the jury, thereby gaining the conviction. We note that the government witnesses who were questioned with regard to their grand jury testimony each recalled having made the statement and confirmed the answers he had given were true. Grand jury testimony may properly be used for the purpose of refreshing the recollection of a witness.[4] The use of such testimony for this purpose rests in the sound discretion of the trial judge.[5] We find no abuse of that discretion in the trial here.

▮ Tager next contends the failure to disclose plea bargaining by the prosecution with the two named but unindicted co-conspirators who ultimately testified at trial requires reversal. *See* United States v. Harris, 462 F.2d 1033 (10th Cir. 1972). We note first there is no evidence in the record of prior plea bargaining by the prosecution in exchange for the testimony of either witness. However, Casady, in the presence of the jury in open court, claimed his Fifth Amendment privilege to refuse to answer questions. Court was recessed at that point until the prosecution received permission to grant immunity to this witness. Upon resumption of the trial, the jury was informed by the trial judge that the witness had been granted immunity from prosecution, and was additionally told that they were not to draw any adverse inferences or any inferences of guilt as to either of the defendants from this fact alone. The jury here was clearly instructed concerning the inducements for testimony of this witness, and those instructions must necessarily have been considered by them in reaching a verdict. With respect to the testimony of Rasmussen, the record does not reveal any prior inducements being made which would have been relevant in attacking his motive for testifying.

▮ The jury, after having retired for their deliberations, requested that they be allowed to hear portions of the testimony of two of the witnesses. The trial judge felt that reading only portions of testimony would tend to unduly emphasize that part of the evidence, denied the request, and advised the jury that if they desired to have read the entire testimony of any of the witnesses, the request would be considered. The jury subsequently requested that they be allowed to hear the testimony of the co-defendant Konys. The request was granted, and the entire testimony of Konys was read to the jury in open court by the court reporter. Tager contends the trial court erred in allowing this testimony to be read back to the jury. He maintains this unduly emphasized that particular testimony, the effect of which was to prejudice him. In Tyler v. United States, 361 F.2d 862, 863 (10th Cir. 1966), we stated that "[i]t was within the sound discretion of the trial judge to determine whether the requested testimony should be read back to the jury. . . ." We find no abuse here of that discretion.

On oral argument, appellant abandoned the asserted trial error relative to the trial court's instructions. The merits of this argument are accordingly not considered.

The record in this case is voluminous, and during the course of our decisional process we have given careful consideration to all of the evidence and to the issues raised by the appellant. We are compelled to the conclusion that a fair trial was afforded to appellant, and the conviction must be affirmed.

4. Collins v. United States, 383 F.2d 296 (10th Cir. 1967).

5. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940) ; Collins v. United States, supra.