UNITED STATES, Appellant,

v.

Vivian ALEXANDER, Appellee.

Nos. 79–1280, 80–116.

District of Columbia Court of Appeals.

Argued June 19, 1980.

Decided Feb. 24, 1981.

John R. Fisher, Asst. U. S. Atty., Washington, D. C., with whom Charles F. C. Ruff, U. S. Atty., John A. Terry and Charles L. Hall, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellant.

William J. Mertens, Public Defender Service, Washington, D. C., with whom Silas J. Wasserstrom, Washington, D. C., Public Defender Service, was on the brief, for appellee.

Before NEWMAN, Chief Judge, and MACK and FERREN, Associate Judges.

MACK, Associate Judge:

At the request of the government, we review in this criminal case two pretrial orders,[1] one suppressing appellee's statements and the other directing production of

---

1. D.C.Code 1973, § 23–104(a)(1).

a witness' grand jury testimony. Appellee is charged with murder in the second-degree while armed. At trial, she intends to show that she acted in self-defense. After a hearing and extensive briefs arguing alleged violations of appellee's Fourth and Fifth Amendment rights, the trial court concluded, under *Miranda*[2] and its progeny, that appellee's Fifth Amendment rights were not violated. However, the court suppressed the statements under the Fourth Amendment as the fruits of an unlawful arrest.[3] In a separate order, pursuant to Super.Ct.Cr.R. 6(e)(2)(C)(i), the court ordered the government to disclose, three days before trial, the grand jury testimony of appellee's young daughter to allow defense preparation. For the reasons set forth in this opinion, we uphold the suppression order, but on Fifth Amendment rather than Fourth Amendment grounds.[4] We reverse the discovery order because we find there is an insufficient showing of particularized need.

## I.

The facts developed at the suppression hearing disclosed the following events. In the morning of April 13, 1979, the police responded to a call for a "woman down" at a given address. At approximately 10:00 a. m., an officer arrived to find an ambulance crew administering aid to a woman lying unconscious on the sidewalk. He learned from Ms. Alexander (appellee), standing nearby, that the victim lived with her and her children. Appellee, who appeared upset, said the victim had fallen down and cut herself. The officer did not realize the situation potentially involved a criminal act until the ambulance crew revealed the victim had been either stabbed or shot. At

that point the officer alerted the Homicide Squad.

Homicide Detective Chaney arrived on the scene soon thereafter. He had first stopped at the hospital and learned that the victim had been stabbed and was in serious condition.[5] He briefly spoke with appellee's two children (ages nine and seventeen) whom he described as "nervous and upset and . . . not being completely truthful." One said she knew nothing; the other refused to talk. He told them they would have to come to the station and make a statement about what they had seen happen inside their house. He did not tell them they were not required to go, or that a parent or adult could accompany them. He considered the only other adult living in the house, Ms. Alexander, a suspect and advised her orally of her *Miranda* rights.[6]

Detective Chaney directed that she be taken to the station for questioning, feeling that environment was more "conducive" to questioning. He did not advise Ms. Alexander that she was under arrest, nor did he consider her to be, although he did testify that he thought "she had no choice" in going to the station. Ms. Alexander was handcuffed and taken to police headquarters. The two daughters were taken to headquarters separately.

When Ms. Alexander arrived, she was taken by Homicide Detective Forbes to an interview room. Just as the interview was commencing, they were interrupted by another detective who had been questioning Ms. Alexander's daughters. Outside the interview room, Detective Forbes was told that one of the daughters had indicated

---

2. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

3. The trial court also suppressed tangible evidence. The government has not appealed that decision.

4. The trial judge did not have the benefit of the reasoning of the Supreme Court's decision in *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980) decided while this appeal was pending.

5. The victim died later that same day.

6. Ms. Alexander had stated she did not see exactly what happened, and later, that the injured woman had walked up the steps and then back down to where she fell. However, Detective Chaney observed only one trail of blood. In his eight years of experience, he thought it unlikely that the victim had stabbed herself.

that Ms. Alexander was the person responsible for the stabbing.[7]

Forbes reentered the room and informed appellee she was under arrest for assault with intent to kill. He advised Ms. Alexander of her constitutional rights under *Miranda* by using a PD 47 form.[8] Forbes read appellee her rights and asked her if she understood them. She answered affirmatively. He then gave her the card to read, and instructed her to answer the questions, sign, and date it. She answered "yes" to the first three questions, but answered "no" to the last question "Are you willing to answer any questions without a lawyer present?" Ms. Alexander signed the card; Detective Forbes signed as a witness. The time noted on the card was 12:22 p. m.

Detective Forbes said no more to appellee regarding her rights or obtaining counsel. Within minutes after she had signed the card and returned it to him, he stated to her "we know what happened," or "we know you are responsible for the stabbing."[9] He then left the room and returned a few moments later with a PD 163 form, used to prosecute the arrestee. He began completing the form, asking Ms. Alexander how to spell her name. In response to her question, he said the form "was the necessary paperwork . . . so he could send her over to jail," and that she was going to jail. A short time later she said "I got to talk to you about something. I want to tell you what happened." She began to relate the events of the morning. Detective Forbes asked her if she were willing to give a written statement. She agreed, and he retrieved the proper form. At this point fresh *Miranda* warnings were given. Appellee indicated she understood her rights and was willing to answer questions without an attorney present. No particular inquiry was made as to why she was willing to talk without an attorney present.[10] The written Defendant's Statement was taken beginning at 12:40 p. m.[11]

7. In the meantime, as a result of questioning appellee's two daughters, the police learned where the knife used in the incident was located. Crime scene examination officers returned to appellee's home and, without a warrant or consent, entered and retrieved the weapon. The trial court ruled the knife suppressed under *Mincey v. Arizona*, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978), the government does not appeal this ruling.

8. PD 47 METROPOLITAN POLICE DEPARTMENT REV. 8/73 WARNING AS TO YOUR RIGHTS.

You are under arrest. Before we ask you any questions, you must understand what your rights are.

You have the right to remain silent. You are not required to say anything to us at any time or to answer questions. Anything you say can be used against you in court.

You have the right to talk to a lawyer for advice before we question you and to have him with you during questioning.

If you cannot afford a lawyer and want one, a lawyer will be provided for you.

If you want to answer questions now without a lawyer present you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer. P–771

WAIVER

1. Have you read or had read to you the warning as to your rights? Yes

2. Do you understand these rights? Yes

3. Do you wish to answer any questions? Yes

4. Are you willing to answer questions without having an attorney present? No

5. Signature of defendant on line below.
   /s/ Vivian Alexander

6. Time 12:22    Date 4–13–79

7. Signature of officer   /s/ David C. Forbes

8. Signature of witness   /s/ Robert L. Chaney

9. He admitted at the hearing that this was an interrogation technique designed to get her to talk.

10. The only question regarding her earlier assertion of a right to have counsel present was the following:
    Q. Mrs. Vivian Alexander when I advised you of your rights before and when you answered question number 4 on the back of the rights card you answered No but now you tell me that you want to tell me what happened is that correct?
    A. Right.

11. We do not know from this record the precise time at which each of these events occurred. We do know that only eighteen minutes elapsed between the time appellee was first

Ms. Alexander testified on her own behalf at the suppression hearing.[12] Her version of the sequence of events was essentially similar to that of the government witnesses. She explained that the victim had been her lover, and that she was worried and upset about the latter's condition while she was questioned and detained by the police. She was also concerned about her children. She saw that her daughters were already present at the Homicide Squad office when she arrived, but she was not allowed to speak with them until she had finished giving her statement. She testified that Detective Chaney entered the interview room during the interview and told her that the victim was going to die.

In addition her recollection was that she did not see the rights card (PD 47) until after she had been questioned. Regarding her answer to question four, she said she thought Detective Forbes was going to get her a lawyer, and that she asked for one. She was unsure, however, whether the detective heard her request because he did not respond. She acknowledged that Detective Forbes did not hit or threaten her. Regarding her understanding of the *Miranda* rights when first given at the scene, she admitted she knew she had a right to be silent, and, in fact, had remained silent. However, she said she did not at that time understand what it meant to have a lawyer nor did she later when she was questioned at the station. She requested an attorney because she was confused, upset, and in need of help.

After receiving extensive memoranda on the suppression issues raised by these facts, including post-hearing briefs, the trial judge issued a comprehensive order directing suppression of the oral and written statements made at the Homicide Squad office. The court concluded that appellee's

Fourth Amendment rights were violated when the police handcuffed her and took her to the Homicide Squad office without probable cause.

At the time defendant was taken into custody, police knew that potentially fatal knife wound injuries had been inflicted on the victim in or near defendant's residence, which defendant shared with the victim and several children, and they suspected that the defendant's on-the-scene explanation of how the victim had been injured was probably false. The police did not know at that time whether defendant, assuming her statements were false, was protecting herself, one of her daughters or some third person. The fact that the daughters, who were home at the time, were also vague and evasive about what happened is as consistent with their own guilt or the guilt of another friend or family member as it is with the guilt of defendant.

The court next considered whether the acquisition, at the station, of the additional information from the appellee's daughter was sufficient to dissipate the taint of the illegal arrest. After performing the analysis designated by the Supreme Court in *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979) and *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), the judge concluded the statements should be suppressed.[13] Given the fast pace at which the events unfolded and the fact that the daughter's statement preceded Ms. Alexander's by merely a few minutes, the court concluded there was insufficient attenuation from the illegal arrest to fall outside the Fourth Amendment exclusionary rule.

The trial judge next turned to the Fifth Amendment issues. He deemed the issue presented as whether appellee's right to

arrested and asserted her *Miranda* right to counsel and the time Detective Forbes began taking the formal written statement.

12. Ms. Alexander, who had a twelfth grade education, had been arrested only once before for a traffic violation; she had never worked in the criminal justice system.

13. The court considered the following *Brown* factors: (1) the temporal proximity of the arrest and the confession; (2) the presence of a significant intervening agent; and particularly, (3) the purpose and flagrancy of the official misconduct. 422 U.S. at 603–04, 95 S.Ct. at 2261–2262.

remain silent was "scrupulously honored," *citing Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975). He found that the police stopped interrogation upon appellee's assertion of a desire not be be questioned without counsel. He rejected appellee's contention that Detective Forbes' statements to defendant that "We know what happened" were tantamount to interrogation, noting:

> [T]he court cannot conclude, on this record, that anything done by the detective constituted interrogation within the meaning of *Miranda* and its progeny. On the contrary, the record reflects that defendant voluntarily gave her statement after realizing that she was going to jail, which she learned in direct response to her own question asked of the detective. She was not interrogated. She simply chose to speak.
>
> ... The court concludes, that, under the totality of circumstances, defendant voluntarily, knowingly and intelligently waived her *Miranda* rights. Although there is no express waiver preceding defendant's oral admission to Detective Forbes, the court can infer from the clear and unequivocal express waiver made prior to the written statement that the antecedent oral statement was also the product of the unfettered exercise of defendant's free will, with a full understanding of her rights. The court concludes that defendant's oral and written statements were both voluntary.

## II.

The Supreme Court cases of *Dunaway v. New York, supra,* and *Brown v. Illinois, supra,*[14] instruct that when a criminal defendant challenges the admissibility of his or her statements made to law enforcement officials the Fifth Amendment issues are to be considered first. Only if the person's statements are deemed voluntary for Fifth Amendment purposes is a Fourth Amendment inquiry warranted.

■ Fundamental to the Fifth Amendment analysis of whether a defendant's statement was voluntarily made is an assurance that his or her will was not overborne—that the statements were not the product of coercion. *Miranda v. Arizona*, 384 U.S. 436, 445, 458, 86 S.Ct. 1602, 1612, 1619, 16 L.Ed.2d 694 (1966). There can be no doubt that a defendant in the custody of police has certain rights before and while being interrogated.

The familiar *Miranda* warnings are the prophylactic safeguard assuring at least notice of those rights. The vast majority of cases raising *Miranda* issues involve this first level of *Miranda* protection—assuring that the warnings were given before questioning commences, and that the rights thereunder were voluntarily waived.[15] However, a second part of the *Miranda* decision prescribed standards for situations where a suspect exercised, rather than waived, one of those rights—the right to remain silent or to the presence of counsel.

> At this point he has shown that he intends to exercise his Fifth Amendment privilege [to remain silent]; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked. If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. [*Miranda, supra* at 474, 86 S.Ct. at 1628].[16]

**14.** *See also Rawlings v. Kentucky*, 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980).

**15.** For our court cases addressing first level *Miranda* rights, *see, e. g., Taylor v. United States*, D.C.App., 380 A.2d 989 (1977); *In re T.T.T.*, D.C.App., 365 A.2d 366 (1976) (trial court found that appellant did not assert *Miranda* rights during questioning).

**16.** For our court cases addressing second level *Miranda* rights, *see, e. g., Calaway v. United States*, D.C.App., 408 A.2d 1220 (1979); *Jackson v. United States*, D.C.App., 404 A.2d 911 (1979); *In re W.B.W.*, D.C.App., 397 A.2d 143 (1979); *Peoples v. United States*, D.C.App., 395 A.2d 41 (1978), *cert. denied*, 442 U.S. 911, 99 S.Ct. 2826, 61 L.Ed.2d 277 (1979). *See also, Taylor v. United States, supra* (defendant, hav-

What concerns us in this case is the so-called "second level" of *Miranda* rights.[17] Appellee here was clearly in police custody—in fact, in the very type of situation central to the *Miranda* court's concern: incommunicado, stationhouse custody. By refusing to waive the presence of counsel in any questioning, appellee invoked her *Miranda* right to counsel. The *Miranda* decision itself would seem to absolutely prohibit any further questioning without the presence of counsel.[18] However, the Supreme Court has yet to answer the precise question of under what conditions, if any, a defendant who has asserted a *Miranda* right to counsel may waive that right. Our court, in *Jackson v. United States, supra,* has rejected the per se prohibition of questioning such a defendant absent counsel. Accordingly, here, as there, we turn to *Michigan v. Mosley, supra,* for an analogous basis for analysis.

In *Mosley* the Supreme Court ruled that a defendant could, in some circumstances, waive a *Miranda* right to silence after it had been asserted. However, it carefully delineated the relevant facts controlling its decision that a voluntary waiver had been made. As a threshold matter it held that the basic objective was to assure that an in-custody defendant's assertion of a right to remain silent was *scrupulously* honored. "To permit the continuation of custodial interrogation after momentary cessation would clearly frustrate the purposes of *Miranda.*" *Mosley, supra,* 423 U.S. at 102, 96 S.Ct. at 325–326. It identified the "critical safeguard" to counteract the coercive pressures of the custodial setting as a person's right to cut-off questioning. *Id.* at 103, 96 S.Ct. at 326.

The *Mosley* Court held that the defendant's rights had been scrupulously honored, therefore the confession was admissible.[19]

ing made statement to one detective, refused to talk to another detective without attorney).

17. We have found useful recent decisions of the highest courts of New Hampshire and New York, setting forth this analysis. *See State v. Nash,* 407 A.2d 365, 367 (N.H.1979); *People v. Grant,* 45 N.Y.2d 366, 408 N.Y.S.2d 429, 380 N.E.2d 257 (1978). *See also, In re C.P.,* D.C. App., 411 A.2d 643 (1980) (Ferren J., dissenting), *vacated and remanded,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), in light of *Rhode Island v. Innis, supra.* For helpful discussions of the issues raised in this case *see generally* Grano, *Rhode Island v. Innis: A Need ·to Reconsider the Constitutional Premises Underlying the Law of Confession,* 17 Am.Crim.L. Rev. 1 (1979); Kamisar, *Brewer v. Williams, Massiah, and Miranda: What is "Interrogation"? When Does it Matter?* 67 Geo.L.J. 1 (1978); Note, *Fifth Amendment, Confession, Self-Incrimination—Does a Request for Counsel Prohibit a Subsequent Waiver of Miranda Prior to the Presence of Counsel?* 23 Wayne L.Rev. 32 (1977).

18. *See Michigan v. Mosley, supra,* 423 U.S. at 109–10 & n.2, 96 S.Ct. at 329 & n.2 (White J., concurring) ("The accused having expressed his own view that he is not competent to deal with the authorities without legal advice, a later decision at the authorities' insistence to make a statement without counsel's presence may properly be viewed with skepticism"); *Rhode Island v. Innis, supra,* 100 S.Ct. at 1688 n.2; *Fare v. Michael C.,* 442 U.S. 707, 99 S.Ct. 2560, 61 L.Ed.2d 197 *reh. denied,* 444 U.S. 887,

100 S.Ct. 186, 62 L.Ed.2d 121 (1979) (in declining to view a request for probation officer as the equivalent to a request for counsel, the Court said "[t]he per se aspect of *Miranda* was thus based on the unique role the lawyer plays in the adversary system of criminal justice in this country.... [T]he lawyer is the one person to whom society as a whole looks as the protector of the legal rights of that person in his dealings with the police and the courts." *Id.* 442 U.S. at 719, 99 S.Ct. at 2569. *United States v. Rodriguez-Gastelum,* 569 F.2d 482, 489 (9th Cir.) (en banc), (Hufstedler, J., dissenting), *cert. denied,* 436 U.S. 919, 98 S.Ct. 2266, 56 L.Ed.2d 760 (1978). *Cf. People v. Cunningham,* 49 N.Y.2d 203, 424 N.Y.S.2d 421, 400 N.E.2d 360 (1980) (noting that the Supreme Court has yet to rule on this issue, court holds under state constitution that suspect in custody who requests assistance of counsel may not be questioned further absent counsel.) *But see United States v. Rodriguez-Gastelum, supra* (majority rejects per se rule); *Jackson v. United States, supra; State v. Monroe,* 101 Idaho 251, 611 P.2d 1036 (1980) (rejects per se rule against questioning in absence of counsel a suspect who has requested counsel); *Commonwealth v. Watkins,* 375 Mass. 472, 379 N.E.2d 1040, 1048 (1978).

19. On *Mosley's* facts, there was no other issue regarding the voluntariness of the waiver, once it was determined that the defendant's rights were scrupulously honored. The opinion is thus silent regarding the appropriate standard, if any, to be applied in making this determina-

The court relied on the following factors: (1) before the first questioning of the defendant, he was carefully advised of his *Miranda* rights, which he orally acknowledged; (2) the police immediately ceased questioning defendant when he indicated he wished it to stop, and made no attempt to resume questioning or ask him to reconsider; (3) there was a two hour break between the first interrogation and the second, performed at a different location, by a different officer, about a different crime; (4) a full and complete set of *Miranda* warnings were given before the second questioning began, including a full and fair opportunity for the defendant to examine his options; (5) finally, the subsequent questioning did not undercut the defendant's previous decision to remain silent because it involved an unrelated offense. *Id.* at 104, 96 S.Ct. at 326–327.

Courts faced with a *Miranda* second-level right-to-counsel issue have turned to these Mosley factors in determining whether a defendant's rights were scrupulously honored. *See, e. g., Peoples v. United States,* D.C.App., 395 A.2d 41 (1978) (in applying the "scrupulously honored" standard where counsel was requested, the court looked to the circumstances summarized in *Mosley*: the confession was deemed voluntary where the defendant was re-questioned only after appearing before a judicial officer and being given fresh *Miranda* warnings, the defendant requested the second interview, and six hours had elapsed); *In re T.T.T.,* D.C.App., 365 A.2d 366, 369 n.3 (1976) (agreed with trial court's conclusions that tape-recorded statement was not voluntary where re-questioning related to same offense and investigation); *People v. Grant,* 45 N.Y.2d 366, 408 N.Y.S.2d 429, 380 N.E.2d 257 (1978) (rights were not scrupulously honored where second interrogation began only ten minutes after defendant exercised right, defendant was not given opportunity to obtain counsel, and officer's statement in interim was calculated to persuade defendant to reconsider); *United States v. Clayton,* 407 F.Supp. 204 (E.D.Wis.1976) (rights not scrupulously honored where defendant was twice questioned within an hour by the same officer concerning the same crime, having asserted his right to silence during the first questioning); *Commonwealth v. Watkins,* 375 Mass. 472, 379 N.E.2d 1040 (1978) (applying "scrupulously honored" standard to request for counsel, confession was found admissible where questioning ceased, the defendant was given an opportunity to call counsel, and renewed questioning was initiated by defendant).

The proper analysis here must begin with an inquiry as to whether the defendant's right to cut-off questioning was scrupulously honored, guided by the *Mosley* decision. *See Calaway v. United States,* D.C.App., 408 A.2d 1220, 1225 (1979). Only if that determination is answered affirmatively can we consider the matter of whether the waiver was itself voluntary as defined by *Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). *See In re C.P., supra* at 650 (dissenting opinion); *State v. Nash,* 407 A.2d 365, 367 (N.H.1979); *People v. Grant,* 45 N.Y.2d 366, 408 N.Y.S.2d 429, 380 N.E.2d 257 (1978).[20]

We are met at the outset by the trial court's conclusion that appellee voluntarily and spontaneously chose to speak. It

tion. *Miranda* itself suggests that the *Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938) standard is warranted—whether there has been "an intentional relinquishment or abandonment of a known right or privilege." *Id.* at 464, 58 S.Ct. at 1023. *See Miranda, supra,* 384 U.S. at 475, 86 S.Ct. at 1628. If waiver of the right to counsel is applicable at all surely this more stringent standard must be applied. *See also Jackson v. United States, supra* at 922; *State v. Nash, supra* at 368, (not only is the assertion of any right generally treated to more stringent judicial scrutiny than the first level warnings, but even stricter standards adhere where there is an assertion of the right to counsel).

20. In that event, the government bears a "greater burden than when it attempts to show a waiver of the right to remain silent." *Jackson v. United States, supra* at 922; *In re C.P., supra* at 650 (dissenting opinion); *Shreeves v. United States,* D.C.App., 395 A.2d 774 (1978), *cert. denied,* 441 U.S. 943, 99 S.Ct. 2161, 60 L.Ed.2d 1045 (1979); *State v. Nash, supra* at 368.

is true that in reviewing the court's findings in a motion to suppress, we must accept its resolution of conflicting testimony,[21] and will not disturb the factual findings so long as they are supported by substantial evidence.[22] On the facts of this case, we conclude as a matter of law that appellee's rights were not scrupulously honored. That being the case we do not reach the question of whether her subsequent waiver was voluntary. Because her rights were not scrupulously honored, *Miranda* and *Mosley* require the exclusion of the statement.

In the trial court's words, the police were dealing with "a criminally naive and unsophisticated defendant." She was taken in handcuffs to homicide headquarters, and placed in a room, incommunicado, for questioning. Her children were taken separately for questioning; she was not allowed to talk to them. She was visibly upset about the incident, and fearful for the condition of the victim. In this environment, she asserted her *Miranda* right not to be questioned without the presence of an attorney.[23] The detective stated that the police knew she had stabbed the victim. He did nothing to acknowledge her request for counsel other than to get a different form.

Q. My question is after she put "no" on this side of the card and signed it after she put "no" to question number four, did you tell her you'd have an attorney appointed for her if she couldn't afford one?

A. No.

Q. After she put "no" on it there, did you tell her you would call an attorney and have him come down right away?

A. No.

When she asked the purpose for the other form she was told she was going to jail. After a few more moments of reflection, appellee began to talk. The officer did not stop her and re-advise her under *Miranda*. When he did stop her and ask if she was willing to make a written statement, he made no special inquiry into why she was now willing to talk without a lawyer.

Q. Did you ever try to explain to her— try to ask her or explain to her why she was willing to change her mind when she had put "no" on the 47?

A. No.

Q. You never orally advised her you would get an attorney down to the office before she made any statement if she wanted one?

A. No, sir.[24]

After only eighteen minutes, appellee began dictating a statement to the detective.

---

21. *United States v. Lyon*, D.C.App., 348 A.2d 297 (1975); *United States v. McNeil*, 140 U.S. App.D.C. 3, 433 F.2d 1109 (1969).

22. D.C.Code 1973, § 17–305(a).

See *In re W.B.W.*, *supra* (in answering question of whether defendant's right to cut off questioning was scrupulously honored, court examined whether there was substantial evidence supporting that conclusion); *Taylor v. United States*, *supra* (conclusion that statements were voluntary is supported by substantial evidence); *Calaway v. United States*, *supra* (after assuring that there was a factual predicate for concluding that defendant's rights were scrupulously honored, and substantial evidence existed to support voluntariness conclusion, trial court affirmed); *Peoples v. United States*, *supra* (trial court's findings of voluntariness and waiver affirmed as they have substantial support in the evidence).

See also *Jackson v. United States*, *supra* (reversed trial court's conclusion that defendant intentionally waived rights when he spontaneously began to talk; insufficient findings on intentional and knowing relinquishment); *In re T.T.T.*, *supra* (reversed trial court's conclusions that juvenile's statements were the product of adolescent fright; apparently accepted trial court's findings of fact, but rejected legal conclusions).

23. She obviously had no inkling of how to obtain an attorney, or what would transpire next.

24. Indeed, the New York court in *People v. Grant*, *supra*, 408 N.Y.S.2d at 434, 380 N.E.2d at 262, relied heavily on just this factor in ruling that the defendant's rights were not scrupulously honored, noting that the "authorities did not afford the defendant an opportunity to obtain the assistance of counsel," and that this "conduct was completely inconsistent with the defendant's request because [the arresting officer] took no steps to afford the defendant an opportunity to obtain an attorney's assistance." *Id.*, 408 N.Y.S.2d at 435, 380 N.E.2d at 263.

These facts compel a conclusion that appellee's rights were not scrupulously honored. Indeed, *none* of the *Mosley* factors were present here: interrogation did not cease; there was no significant break; no change of parties, place, or subject matter; and most significantly, there was no new complete set of *Miranda* warnings before the defendant was well into her oral statement.[25]

Our conclusion that appellee's rights were not scrupulously honored is reinforced by the recent Supreme Court decision of *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). In that case, the Supreme Court for the first time identified what police conduct constituted the functional equivalent of "interrogation" for purposes of *Miranda*. The court concluded that the *Miranda* safeguards apply to any words or actions by police made to the defendant that they should know are reasonably likely to elicit an incriminating response. *Id.*, 100 S.Ct. at 1689. The court noted in a footnote "where a police practice is designed to elicit an incriminating response from the accused, it is unlikely that the practice will not also be one which the police should have known was reasonably likely to have that effect." *Id.*, 100 S.Ct. at 1690 n.7. The court went on to hold that a casual remark from one officer to another in the presence of the defendant did not amount to prohibited interrogation as thus defined.

We have a different situation here. After appellee asserted her *Miranda* right to counsel, Detective Forbes followed up with the statement "we know what happened" or "we know you are responsible for the stabbing." No one else was present. At the suppression hearing, the following inquiry took place during the cross-examination of Detective Forbes:

Q. Why did you tell her that [we know what happened]?

A. I was typing up the 163.

Q. To try to get her to talk?

A. That could be a technique I could use, yes.

Q. Was that a technique you used in this case?

A. I would have to say honestly, yes it was.

These facts, in light of *Innis*, are contrary to the court's conclusion that nothing done by the detective constituted interrogation. We view this as conclusively demonstrating that the police did not scrupulously honor appellee's request not to talk without a lawyer present.[26] Even without the admission by Detective Forbes, the events here suggest those coercive circumstances prohibited by *Miranda*. Detective Forbes' admission buttresses our conclusion as a matter of law that appellee's rights were not scrupulously honored within the meaning of *Mosley* and footnote 7 in *Innis*. Interrogation of appellee continued after assertion of her *Miranda* rights. We thus disagree with the trial judge's conclusion that the appellee was not interrogated within the meaning of *Miranda* and that her rights were scrupulously honored.

**25.** *Accord People v. Grant, supra* (rights not scrupulously honored where only ten minutes between exercising right to have counsel present and second interrogation, even though readvised, where officer in interim gave defendant a fuller "explanation" of case against him); *State v. Wiberg*, 296 N.W.2d 388 (Minn.1980).

**26.** *Accord State v. Durand*, 206 Neb. 45, 293 N.W.2d 383 (1980) (showing the defendant police reports of other crimes after assertion of *Miranda* right constituted functional equivalent of interrogation; defendant's choice was not scrupulously honored); *Commonwealth v. Brant*, —— Mass. ——, 406 N.E.2d 1021, *cert. denied*, —— U.S. ——, 101 S.Ct. 545, 66 L.Ed.2d 301 (1980) (where authorities "hoped and expected" that defendant would change mind and make a statement as a result of their further statements and a private interview with codefendant, defendant was "interrogated"; defendant's right not scrupulously honored). *Cf. Harryman v. Estelle*, 616 F.2d 870 (5th Cir. 1980) (en banc) (pre-*Miranda* warning question by officer that elicited incriminating response was not merely an "exclamation of surprise", but was interrogation).

But *see State v. Jones*, 386 So.2d 1363 (La. 1980) (suspect, accused of murdering his infant son merely changed mind after invoking right to counsel; subsequent statement by officer that "God takes care of little babies" was in the nature of consolation, rather than interrogation).

In our view, *Mosley* provides the only guidance by which a court can even reach the voluntariness issue. Since we conclude that appellee's rights were not scrupulously honored, her ensuing confession was not voluntary for Fifth Amendment purposes.[27] Because we find appellee's Fifth Amendment rights to have been violated, the statements are properly suppressed on that basis. We need not address the Fourth Amendment analysis relied upon by the trial judge.

### III.

The government contends that the trial court also erred in compelling disclosure of the grand jury testimony of appellee's daughter, Linda.[28] More specifically, the government 1) questions the authority of the trial court, arguing that the Jencks Act (18 U.S.C. § 3500 (1970)) limits disclosure to the period following the trial testimony of a government witness, and 2) in any event, appellee failed to establish the requisite need justifying disclosure.

■ We do not reach the government's first argument.[29] Instead, we assume solely for purposes of this appeal that the Jencks Act does not preempt trial court discretion to order pretrial discovery of grand jury statements of government witnesses pursuant to Super.Ct.Cr.R. 6(e). As to Fed.R. Crim.P. 6(e) (substantially identical to our Rule 6(e)) it is clear that the decision whether to release grand jury transcripts is committed to the discretion of the trial judge. *Pittsburgh Plate Glass Co. v. United States*, 360 U.S. 395, 399, 79 S.Ct. 1237, 1240–1241, 3 L.Ed.2d 1323 (1958). *See also Douglas Oil Co. v. Petrol Stops Northwest*, 441 U.S. 211, 99 S.Ct. 1667, 60 L.Ed.2d 156 (1979). The question thus becomes whether the trial judge abused his discretion in holding that the appellee had demonstrated a particularized need sufficient to outweigh the strong policy in favor of grand jury secrecy. We agree with the government that the trial judge abused his discretion.

Appellee argues that like the testimony of the witnesses in *Dennis v. United States*, 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966), Linda's testimony may be critical to a determination of what occurred on the day in question. The defense is seriously

---

**27.** We nonetheless note that the trial court applied the incorrect standard—did defendant voluntarily, knowingly and intelligently waive her rights. That standard is correct for a determination of first level *Miranda* waiver, *see Fare v. Michael C., supra; North Carolina v. Butler*, 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979). For second level waiver, the stricter *Zerbst* standard is applicable—an intentional relinquishment or abandonment of a known right or privilege. *See Brewer v. Williams*, 430 U.S. 387, 404, 97 S.Ct. 1232, 1242, 51 L.Ed.2d 424 (1977); *Jackson v. United States, supra* at 922; *Shreeves v. United States, supra*.

**28.** On September 14, 1979, appellee moved to compel pretrial disclosure of the grand jury testimony of her two daughters, Linda (age nine at the time of the stabbing) and Bridgette (age seventeen at the time of the stabbing). Both daughters were inside the house at the time of the stabbing and testified before the grand jury. The government anticipates calling the girls as witnesses at trial. Defense counsel is considering calling the girls as witnesses. The motion to compel asserted that the grand jury testimony was required "to adequately prepare the daughters to become witnesses at the trial." The trial court ordered the pretrial disclosure of Linda's grand jury testimony not later than three days before trial. It

denied pretrial disclosure of Bridgette's testimony because the court was not persuaded that a seventeen-year-old could not recall the events of the day in question or her grand jury testimony.

**29.** The government contends that the 1970 amendment to the Jencks Act precludes a trial court from ordering pretrial disclosure of the grand jury testimony of a prospective government witness. The trial court rejected this argument.

This court has never ruled squarely on this question and we refrain from doing so now. The federal courts are split on the question. *See, e. g., United States v. Tager*, 481 F.2d 97, 100 (10th Cir. 1973), *cert. denied*, 415 U.S. 914, 94 S.Ct. 1410, 39 L.Ed.2d 469, *reh. denied*, 416 U.S. 952, 94 S.Ct. 1962, 40 L.Ed.2d 302 (1974) ("[u]nder the 1970 amendment to 18 U.S.C. § 3500, the defendant has no right to pre-trial discovery of statements made by government witnesses to the grand jury" (footnote omitted); *United States v. Budzanoski*, 462 F.2d 443, 454 (3rd Cir.), *cert. denied*, 409 U.S. 949, 93 S.Ct. 271, 34 L.Ed.2d 220 (1972) (the 1970 amendment to the Jencks Act does not affect pretrial discovery of grand jury testimony).

considering calling her as a witness. The grand jury transcript is sought to refresh her recollection as to details that might support appellee's theory of self defense and to give Linda "time, away from the pressure of the actual trial, to think about [her] earlier testimony and to explain any confusions, misunderstandings, or inconsistencies which might exist between [her] earlier testimony and [her] present recollection of the facts."

In its appeal of the order granting disclosure, the government points to the strong emotional bond between appellee and her daughter and the statement by the defense that Linda does not "wish to do anything that would harm [her] mother" (Appellee's Supporting Memorandum at 6). It is concerned that the defense seeks pretrial access in order to defuse or explain away any conflicts between the child's grand jury testimony and the testimony the child may now be prepared to give at trial. Alternatively, the government suggests that perhaps the appellee is seeking pretrial disclosure in order to conform her testimony to the earlier grand jury statements of her daughters.[30]

The trial judge held that the need to prepare a defense witness for trial was generally insufficient under the *Dennis* standard to warrant disclosure of the witness' grand jury testimony. However, under the unique circumstances of this case, the child's age, her inability to remember her testimony and the particular facts of the case were factors which required pretrial disclosure.

The order noted in a footnote that from the jury's perspective the difference between an unjustified homicide and a killing in self defense may turn on "the most subtle shadings of the facts." Therefore, it was important to give both sides access to all relevant information.

*Johnson v. United States*, D.C.App., 398 A.2d 354 (1979) sets out the elements an appellate court must consider when it reviews an exercise of discretion by the trial judge. They include: 1) whether the particular determination was committed to the trial court's discretion; 2) if the trial court recognized its discretionary powers, did it purport to exercise them; 3) whether the record reflected sufficient facts upon which the determination was based; 4) whether the trial court exercised its discretion erroneously; and 5) where the trial court exercised its discretion erroneously, whether the magnitude of the error requires reversal.

Our review of this record indicates that the trial judge recognized his discretionary powers under Super.Ct.Cr.R. 6(e) and had a sufficient factual basis upon which to make a determination. In considering, however, whether he exercised that discretion erroneously we must determine whether he relied on improper factors. In the context of a motion for pretrial disclosure of grand jury testimony, the test is whether the party seeking disclosure has established a particularized need that outweighs time-worn considerations. Thus it is that grand jury proceedings have traditionally been kept secret. *See United States v. Procter & Gamble*, 356 U.S. 677, 681, 78 S.Ct. 983, 986, 2 L.Ed.2d 1077 (1958); *Pittsburgh Plate Glass Co. v. United States, supra*, 360 U.S. at 399–400, 79 S.Ct. at 1241. Yet, the courts have recognized that in some cases justice requires the production of discrete portions of the transcripts for use in judicial proceedings. *Procter & Gamble, supra; Dennis v. United States, supra*. The burden is on the parties seeking disclosure to "show that the material they seek is needed to avoid a possible injustice in another judicial proceeding, that the need for disclosure is greater than the need for continued secrecy, and that their re-

30. The trial judge characterized the government's concern that the defendant might exert undue influence over her daughters as an "unsupported assertion." While finding no evidence that the defense had attempted to tamper with the witnesses (*see Allen v. United States*, 390 F.2d 476, 480 (D.C.Cir. 1968)), the trial court recognized that with the passage of time the possibility exists that the children's testimony may become less favorable to the government. This possibility exists due to the continued close relationship between appellee and her children and quite apart from the disclosure of the grand jury testimony.

quest is structured to cover only material so needed." *Douglas Oil Co. v. Petrol Stops Northwest, supra,* 441 U.S. at 222, 99 S.Ct. at 1674.

■ The Supreme Court in *Procter & Gamble, supra,* 356 U.S. at 683, 78 S.Ct. at 987, viewed the release of grand jury testimony to refresh a witness' recollection as a sufficient particularized need. In the instant case, however, appellee does not contend that the child cannot remember the day in question. Appellee admits that the child has maintained a reasonably consistent version of the events of April 13, 1979. Appellee states, however, that the child cannot recall her grand jury testimony. Therefore, the only context in which Linda, as a *defense* witness, would have use for her grand jury testimony before trial would be to think about and explain any inconsistencies between that grand jury testimony and her present recollections. Such a use is not a particularized need sufficient to outweigh the need for grand jury secrecy. To the extent that the trial court invoked the age of the witness and the inability to recall what she had previously *said* as justifying disclosure, he was relying upon improper factors. *See Johnson, supra* at 365. Put another way, in the absence of a demonstrated need for a transcript of grand jury testimony to refresh recollection, it is improper to demand access to that testimony solely for the purposes of avoiding impeachment, irrespective of the witness' age.

With respect to details in Linda's grand jury testimony which might support a self-defense theory, we note that appellee through a proper motion may request exculpatory material within the possession of the government. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

We also note that Linda is expected to be called as a government witness. At the close of direct examination by the government, the relevant portion of her grand jury testimony will be made available to the defense in accordance with the Jencks Act.[31]

■ Since exculpatory material may be sought through a *Brady* request and the relevant portion of the child's grand jury testimony will be available at the close of direct examination by the government, we see no reason for compelling pretrial release of Linda's grand jury testimony. The child's recollection of the events of April 13th has remained consistent. Appellee has not made a showing that the testimony is needed at this juncture. We hold as a matter of law that the appellee did not demonstrate a particularized need justifying disclosure of the child's grand jury testimony and thus the trial judge abused his discretion in ordering disclosure.

The trial court's order suppressing evidence is affirmed for reasons other than those relied upon. The trial court's order compelling disclosure of grand jury testimony is reversed.

*So ordered.*

---

31. Appellee, in a supplementary memorandum, suggests that there is authority for the proposition that Fed.R.Crim.P. 26.2 (effective December 1, 1980) makes it clear that the court has the authority to order production of Jencks material at any time. *See United States v. Algie,* 503 F.Supp. 783 *amended* at 799 (E.D. Ky.1980). In view of our disposition of this case, we do not address ourselves to this issue.