Georges AGUEHOUNDE,
et al., Appellant,

v.

DISTRICT OF COLUMBIA, Appellee.

DISTRICT OF COLUMBIA, Appellant,

v.

Erica DAVIS, Appellee.

Nos. 93–CV–1116, 93–CV–1213.

District of Columbia Court of Appeals.

Argued Feb. 27, 1995.
Decided Sept. 25, 1995.

Patrick A. Malone, with whom Jacob A. Stein, Washington, DC, was on the brief, for appellant Aguehounde.

Thomas H. Tallbot for appellee Davis.

Donna Murasky, Assistant Corporation Counsel, with whom Vanessa Ruiz, Acting Corporation Counsel at the time brief was filed, and Charles L. Reischel, Deputy Corporation Counsel, Washington, DC, were on the brief for appellee District of Columbia.

Before STEADMAN, SCHWELB, and KING, Associate Judges.

Opinion for the court by Associate Judge KING.

Dissenting opinion by Associate Judge SCHWELB at p. 454.

KING, Associate Judge:

This appeal presents the question whether the setting of the timing of a traffic light by a municipal employee is a discretionary act which would make the municipality immune from liability for injuries proximately caused by the interval set. We. hold, under the circumstances presented here, that such an act is discretionary, thereby conferring immunity from liability on the District.

In this negligence action against the District for injuries resulting from an automobile striking a pedestrian in a crosswalk, the pedestrian, appellant Georges Aguehounde ("Aguehounde"), seeks reversal of the trial court's judgment in favor of the District of Columbia ("District") and reinstatement of the jury's verdict in his favor. Aguehounde contends the trial court erred in granting the District's motion for judgment as a matter of law on the ground that the District was immune from tort liability for the discretionary act of setting the timing of traffic light intervals. Aguehounde also maintains that the trial court erred in ruling that he was contributorily negligent as a matter of law for failing to look in the direction of the vehicle which struck him before he stepped into the crosswalk. For the reasons set forth below, we affirm the trial court's grant of the District's motion for judgment as a matter of law.

I.

At approximately 5:00 p.m. on April 23, 1990, Aguehounde was struck by a car driven by Erica Davis ("Davis") after he stepped into the crosswalk on Fessenden Street as he walked north on the east side of Wisconsin Avenue (which runs in a north-north-west/south-southeast direction) in northwest Washington, D.C. The Davis vehicle, which was proceeding east on Fessenden St., (which runs in an east/west direction) struck Aguehounde in the crosswalk on the east side of Wisconsin Ave. Aguehounde testified that as he approached the Fessenden St./Wisconsin Ave. intersection, and when he was three or four steps from the southeast corner of that intersection, he looked to his left and did not see any vehicles approaching from the west on Fessenden Street. He further testified that when he reached the corner he saw that the light facing him was green and that cars, pointed in a westerly direction, were stopped to his right on Fessenden Street. He could not recall whether the "walk" or "don't walk" sign was on. Aguehounde acknowledged that he did not stop at the corner before stepping into the crosswalk. He also stated that he did not remember looking to his left or seeing Davis's car approach him from that direction as he stepped into the intersection.

Davis, the driver of the car which struck Aguehounde, testified that the light facing her turned from red to green when she was approximately one block from the Wisconsin Ave. intersection. She further testified that the traffic light was still green and she was traveling approximately 20 miles per hour as she proceeded through the intersection in her easterly course on Fessenden St. She first noticed Aguehounde standing on the curb as she passed through the intersection into the crosswalk. Aguehounde then took a big step out in front of her car while it was in the crosswalk. Davis testified that Ague-

hounde was looking away from her car and she never saw him look in her direction. She applied her brakes, but nonetheless struck Aguehounde who landed 3–5 feet in front of her car.

As a result of the injuries sustained in the collision, Aguehounde and his wife brought this negligence action against the District,[1] alleging that: the District failed to follow the proper engineering standards in setting the length of the "clearance interval" at the intersection; this failure caused the District to set a clearance interval of too short a duration to allow cars to clear the intersection and the crosswalks; and consequently, Davis's car was still in the intersection when Aguehounde stepped into the crosswalk on a green light.[2]

A jury trial was conducted in May, 1993 before Judge Burgess. The District's motion for judgment as a matter of law on the ground that it was immune from suit because the setting of the clearance interval was a discretionary act, was denied. The jury found that the District's setting of the timing of the clearance interval was the proximate cause of Aguehounde's paralyzing injuries, and awarded him $7,318,313.20 in damages, and his wife $602,913 on her claim for loss of consortium. In addition, the jury rejected the District's contention that Aguehounde had been contributorily negligent.

Thereafter, the District moved for judgment as a matter of law on the grounds that the timing of the light is a discretionary function immune from tort liability, and that Aguehounde was contributorily negligent as a matter of law. In a fifty-five page Memorandum and Order, Judge Burgess granted the District's motion, concluding that the District was immune from liability because the decision to set the length of the clearance interval involved policy considerations, and because the District had not adopted a specific directive taking away the traffic engineer's discretion in establishing timing intervals. The trial court also ruled that Aguehounde was contributory negligent as a matter of law in entering the intersection without taking reasonable steps to ensure his own safety.

On appeal, in No. 93–CV–1116, Aguehounde contends the trial court erred in granting the District's Motion for judgment as a matter of law, alleging that: (1) setting the clearance interval is a ministerial act, devoid of policy considerations; (2) the District removed any discretion in the timing by adopting the national traffic formula; (3) the trial court's factual finding on the immunity issue violated the Seventh Amendment;[3]

1. Aguehounde had also named Erica and Carolyn Davis, the driver and owner of the car, as defendants. The District subsequently filed a cross-claim against both of the Davises, seeking contribution for Erica Davis's actions. On May 3, 1993, the court granted Aguehounde's motion to dismiss the Davises as defendants. However, because of the District's pending cross-claim against the Davises, the court decided to submit an advisory interrogatory to the jury on Erica Davis's negligence. The jury returned an advisory verdict against Davis, concluding that she had been negligent. The jury's conclusion was rejected by the trial court in an order filed on June 9, 1993, in which the court found that the evidence showed that Davis was not negligent and that Aguehounde was negligent. That action by the trial court was separately appealed by the District in No. 93–CV–1213.

In the event this court reverses the trial court's grant of judgment as a matter of law, the District seeks a reversal of the trial court's denial of its motion for a new trial in No. 93–CV–1116, and the dismissal of the District's cross-claim against the driver of the automobile, Erica Davis, in No. 93–CV–1213. Because we affirm the trial court's entry of judgment as a matter of law for the District, we do not need to consider either of these issues. Therefore No. 93–CV–1213 is dismissed as moot.

2. Aguehounde also alleged that the District was negligent in setting the width of the traffic lanes on Fessenden Street and in failing to replace missing sun visors on the traffic lights. Although the jury concluded the District was negligent in both respects, it also found that this negligence was not a proximate cause of Aguehounde's injuries. Aguehounde's other claim, that the District was negligent in failing to conduct regular inspections of the traffic signals, was disposed of by the trial judge by the grant of the District's motion for a directed verdict on the issue. Neither the jury's findings nor the trial court's entry of a directed verdict on these issues have been challenged in this appeal.

3. The determination of whether a governmental function is discretionary or ministerial is one of law to be made by the trial judge, not the jury, see, e.g., North Wash. Neighbors, Inc., 367 A.2d 143, 148 n. 7 (D.C.1976), cert. denied, 434 U.S. 823, 98 S.Ct. 68, 54 L.Ed.2d 80 (1977), and thus

and (4) Aguehounde was not contributorily negligent as a matter of law for entering the crosswalk.[4]

## II.

Before turning to the merits, a brief discussion of practices relating to the timing of traffic lights will be helpful to understanding the issue presented. The clearance interval of a traffic light is the amount of time allocated to the yellow light which occurs between the green light for one street and the green light for the cross street at an intersection. At some intersections an "all-red" sequence is added, meaning there is a red light in each direction at the same time for the duration of that sequence, which is ordinarily no more than one or two seconds. The purpose of the clearance interval is: (1) to allow a driver sufficient time to either come to a complete stop before entering the intersection or to clear the intersection before the crossing light turns green; and (2) to keep opposing traffic and pedestrians from entering the intersection until the vehicles headed in the opposite direction have passed through the intersection.

It is undisputed that in 1985 the clearance interval at the Wisconsin Ave./Fessenden St. intersection for traffic coming from Davis's direction was 4.5 seconds, meaning the light facing traffic on Fessenden St. would turn from green to yellow for 4.5 seconds before the light facing traffic on Wisconsin Ave. would turn to green. In October 1989, the interval was changed to 4.0 seconds.

The principal formula used by the District in setting the timing of traffic light intervals is contained in the chart "Required Yellow Interval In Seconds," which provides:

$$Y = T + \tfrac{1}{2}\ \frac{V}{A} + \frac{(W + L)}{V}$$

The factor "Y" is the clearance interval expressed in seconds. "T" represents the "perception reaction time," which is the time it takes a driver to perceive the yellow light and react to it by moving his foot from the accelerator to the brake, and for braking to begin. The "accepted figure" for "T" is one second. The second part of the formula ($\tfrac{1}{2}$ "V" divided by "A") calculates the "accepted deceleration rate for a controlled stop" with "V" being the velocity of the vehicle, expressed in feet per second, and "A" representing the deceleration rate of a vehicle, expressed in feet per second per second. The speed limit at the intersection was 25 mph or 36.7 feet per second. Typical "A" values vary from 10, for a "fairly fast stop," to 15 for a "more conservative, comfortable stop." The third part of the formula computes the time it would take a car to clear the intersection. This is done by adding the width of the intersection ("W") to the length of the car ("L") and dividing by the velocity at which the car is traveling in feet per second ("V"). In general, 12 feet is used as the "L" for automobiles, and a larger number is used for longer vehicles such as trucks. In applying this formula, the greater the speed, the shorter the clearance interval and vice versa.

A six-second clearance interval[5] involving four seconds of yellow and two of all-red, which Aguehounde contends should have been set for the intersection, would have allowed vehicles to clear the intersection and the crosswalks before the green light for opposing traffic and pedestrians would permit entry to the intersection, thus maximizing pedestrian safety. A four or 4.5 second clearance interval, however, might not necessarily permit all traffic to fully clear the intersection before pedestrians were permit-

---

Aguehounde's contention that the trial court's findings on the immunity issue "were contrary to the jury's findings of fact" and therefore violated the Seventh Amendment is without merit.

4. Because we affirm on the discretionary function issue, we do not resolve the contributory negligence issue.

5. Clyde Richard, the accident reconstruction expert called by Aguehounde, explained that the six-second interval was calculated by using: a

perception reading time of 1 second; a deceleration rate of 10, and a speed factor of 36.7 feet/second, resulting in a duration of 1.8 seconds for the second part of the formula; a street width of 106 feet, car length of 12 feet, and the same speed factor of 36.7 feet/second for a duration of 3.2 seconds for the third part of the formula. Thus, the total duration using these numbers is 1 second + 1.8 seconds + 3.2 seconds, for a total of 6 seconds.

ted to enter the intersection and, consequently, traffic flow, but not pedestrian safety, would be maximized.

## III.

### A. Is Setting Traffic Light Intervals a Discretionary Function?

■ Under the common law, a municipality is immune from suit for decisions made pursuant to the exercise of discretion, but not for actions which are ministerial.[6] *McKethean v. WMATA*, 588 A.2d 708, 715 (D.C.1991); *Elgin v. District of Columbia*, 119 U.S.App. D.C. 116, 119, 337 F.2d 152, 155 (1964). Whether a function is discretionary or ministerial is a question going to the subject matter jurisdiction of the trial court. *District of Columbia v. North Wash. Neighbors, Inc.*, *supra* note 3, 367 A.2d at 148 n. 7. It is a determination to be made by the trial judge, not the jury, and this court conducts a *de novo* review of the trial court's determination of whether or not the action was discretionary. *See e.g., id.; Daigle v. Shell Oil Co.*, 972 F.2d 1527, 1537, 1539 (10th Cir.1992). However, as is the case with any *de novo* review, "we must accept the trial court's resolution of conflicting testimony and will not disturb the factual findings so long as they are supported by substantial evidence." *United States v. Alexander*, 428 A.2d 42, 50 (D.C.1981) (reviewing trial court's resolution

of a motion to suppress tangible evidence).[7] Further, when determining whether the act is discretionary, which determines whether the court has subject matter jurisdiction, the trial court is not confined to considering only that evidence which was also heard by the jury; instead, the court may consider all evidence coming to its attention bearing on that issue. *See, e.g., Matthews v. Automated Bus. Sys. & Serv.*, 558 A.2d 1175, 1179–80 (D.C.1989) ("the court has broad discretion in determining how to proceed in finding such [jurisdictional] facts, including basing its decision on affidavits").[8]

At the outset, the trial court must determine whether the act is a discretionary or ministerial function under the circumstances presented. *McKethean*, 588 A.2d at 715. While "[c]haracterizing an act as discretionary or ministerial is not always an easy task," *id.*, discretionary acts are generally defined as those acts involving the formulation of policy while ministerial acts are defined as those relating to the execution of policy. *See id.; Wade v. District of Columbia*, 310 A.2d 857, 860 (D.C.1973) (en banc) (discretionary functions are those which, if liable in tort, would pose threats to the quality and efficiency of the government). Administrative decisions which require the government to balance competing considerations are considered discretionary acts. *McKethean*, 588

---

**6.** Strictly speaking, the common law terms distinguishing actions by a municipality which were immune from liability from those actions which were not, were "governmental" and "proprietary," respectively. Over time, however, the terminology has evolved to the "discretionary" versus "ministerial" formulation used in this opinion. For a thorough discussion of this evolution, *see Elgin, supra*, 119 U.S.App.D.C. at 118–19, 337 F.2d at 154–55.

**7.** *See also, Jefferson v. United States*, 631 A.2d 13, 17 (D.C.1993) (reviewing determination that defendant satisfied burden of proof of prima facie case); *Patton v. United States*, 633 A.2d 800, 814 (D.C.1993) (reviewing determination that appellant was neither seized nor in custody); *Prophet v. United States*, 602 A.2d 1087, 1091–92 (D.C. 1992) (reviewing probable cause determination); *see also In re Baby Boy C.*, 630 A.2d 670, 683 (D.C.1993), *cert. denied*, — U.S. —, 115 S.Ct. 58, 130 L.Ed.2d 16 (1994) (under D.C.Code § 17–305(a) the Court of Appeals "must give great deference to the trial court's factual findings and may not set them aside unless it appears

they are plainly wrong or without any evidentiary foundation").

**8.** *See also, United States v. Tucker*, 404 U.S. 443, 446, 92 S.Ct. 589, 591, 30 L.Ed.2d 592 (1972) ("A judge may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come.") (citations omitted); *Hecht Co. v. District of Columbia*, 139 A.2d 857, 859–60 (D.C.1958) (trial judge properly considered record of first trial which was not formally introduced into evidence at the second trial in reaching a decision on the merits of a cross-claim in second trial); *Collins v. United States*, 631 A.2d 48, 50 (D.C.1993) ("It is a well-established principle of law that a trial court may consider a wide range of information in fashioning an appropriate sentence ... [including] any reliable evidence ... that was not introduced at trial") (citations omitted); *West v. United States*, 604 A.2d 422, 427 (D.C.1992) (in resolving a motion to suppress, evidence introduced at trial as well as evidence introduced at the pre-trial hearing may be considered).

A.2d at 715. By barring suit for such actions, Congress "prevent[s] judicial "second-guessing" of legislative and administrative decisions grounded in social, economic and political policy through the medium of an action in tort." *United States v. Varig Airlines*, 467 U.S. 797, 814, 104 S.Ct. 2755, 2764, 81 L.Ed.2d 660 (1984).

■ To determine whether a given governmental action is discretionary or ministerial, we first determine whether it is the kind of action "that the discretionary function exception was designed to shield;" that is, whether the action involves "the permissible exercise of policy judgment." *Berkovitz v. United States*, 486 U.S. 531, 536–7, 108 S.Ct. 1954, 1958–59, 100 L.Ed.2d 531 (1988) (citation omitted); *McKethean*, 588 A.2d at 715. If the answer to this first inquiry is yes, then the action is immune from suit, unless the government has adopted a "statute, regulation or policy [that] specifically prescribes a course of action for an employee to follow." *Berkovitz*, 486 U.S. at 536, 108 S.Ct. at 1958; *McKethean*, 588 A.2d at 715. If such a specific directive exists which removes the otherwise unfettered discretion of the government employee, the action is ministerial, opening the government to suit if not performed correctly.

■ Aguehounde contends that the trial court erred in finding that the setting of the clearance intervals was a discretionary act because the decision did not involve policy considerations making it the type of action intended to be shielded by immunity. He further contends that, even if setting the timing was a discretionary act, the District is not immune because the District had adopted a specific formula which its employees were required to follow in setting traffic light intervals, thereby removing any element of choice the traffic engineers may have had.

It was clear to the trial court that setting traffic signal intervals "is the type of function that the discretionary function rule is designed to shield." The trial court further observed that setting traffic signal intervals:

involves considerations of safety not only for pedestrians but for travellers, and it involves a balancing of safety needs against the need to assure adequate traffic flow, which itself involves considerations of safety as well as commerce and convenience. Balancing these factors also requires the ascertainment of facts, such as numbers of vehicles and pedestrians, and ways in which drivers and pedestrians behave in the aggregate, which are peculiarly subject to study and expertise. Subjecting the decisions of traffic engineers to litigation and to second-guessing by jurors would deter effective government.

We fully agree, and therefore hold, for the reasons relied upon by the trial court, that the timing of signal intervals involves balancing various economic, political and social considerations and is therefore a discretionary function.[9] For example, the need to accommodate pedestrians may be paramount at some intersections, but of only secondary importance at other intersections. Thus, intersections with high pedestrian traffic might call for different considerations than those appropriate at intersections where there is little or no pedestrian traffic but the interest in expeditiously moving vehicular traffic predominates. These determinations are clearly judgment calls involving the application of policy considerations as well as a knowledge of the traffic flow needs of the area where the particular intersection is located. The timing interval is therefore one calling for an exercise of discretion.

Aguehounde maintains, nonetheless, that the timing of light intervals "cannot fairly be characterized as a [traffic] design decision," and is thus not immune from suit under the

9. *See District of Columbia v. Pace*, 498 A.2d 226, 229 (D.C.1985) ("street design falls squarely within the ambit of th[e] definition" of discretionary function, and "the general principle of design immunity has been established in the District for close to a century") (citation omitted); *Urow v. District of Columbia*, 114 U.S.App.D.C. 350, 316 F.2d 351, 352 (1963) *cert. denied*, 375 U.S. 826, 84 S.Ct. 69, 11 L.Ed.2d 59 (1963)

("The establishment of … a general traffic control plan is essentially legislative in character and is the result of the … exercise of discretion and judgment"); *North Wash. Neighbors*, 367 A.2d at 148 n. 7 ("the designing of streets and the control of the flow of traffic over them [are] discretionary"); *McKethean*, 588 A.2d at 715 ("overall traffic and safety design [is] a discretionary policy decision.").

authorities cited above. Essentially, Aguehounde contends that the design of the intersection had already been established through the decisions regarding the width of the streets, the permitted speed of the cars, and the installation of traffic lights. Consequently, he argues, the timing of the yellow light is merely an implementation of the pre-existing design and thus not discretionary. This argument misapprehends established law in this jurisdiction. For example, in *McKethean* we held that "the decision to relocate a bus stop ... is *part* of overall traffic and safety design," *McKethean*, 588 A.2d at 715 (emphasis added), and in *Urow* we determined that "the placement of traffic control devices [is] *one aspect* of street design." *Pace, supra*, 498 A.2d at 229 (citing *Urow, supra* note 9, 114 U.S.App.D.C. 350, 316 F.2d 351) (emphasis added).

Nor do we find any support for our dissenting colleague's assertion that government conduct is insulated from liability only where the official "*actually* exercised discretion." The dissent concedes that there is no dispositive District precedent supporting that view, and in fact, to the extent it has been addressed, the contrary is true. For example, in *McKethean, supra*, 588 A.2d at 715, we cited with approval the observation by the U.S. Supreme Court that "where there is room for policy judgment and decision, there is discretion." *Dalehite v. United States*, 346 U.S. 15, 36, 73 S.Ct. 956, 968, 97 L.Ed. 1427 (1953). Consequently, an act is deemed discretionary where it is shown to involve policy judgment and decisions, but does not require proof that *every* myriad and intricate decision involved in the process required a specific balancing of policy decisions.

We conclude, for the reasons relied upon in *McKethean* and *Urow*, that the timing of the signal interval is simply one element of traffic design. To view the timing of a traffic light in a vacuum would ignore the effect that the timing of one interval has on the overall traffic pattern in the District. The setting of one light affects the timing and control of traffic on the entire street and its intersections, and can thus impact the city-wide traffic flow. The decision regarding the timing of the light is thus an integral part of overall traffic flow decisions and cannot be singled out.[10] To subject one aspect of overall traffic design to judicial second-guessing would impermissibly impact the District's autonomy in regulating traffic flow. Therefore, because our authorities have squarely held that traffic design is a discretionary function and that the various aspects of such design are also discretionary, we hold that setting traffic intervals is likewise discretionary. *See District of Columbia v. Pace*, 498 A.2d at 229; *McKethean*, 588 A.2d at 715; *North Wash. Neighbors*, 367 A.2d at 148 n. 7.

Aguehounde also contends that the light interval decision "involved purely engineering calculations" requiring professional expertise, but not any policy considerations, thus making it a ministerial rather than a discretionary act. This claim is premised on the proposition that, to establish immunity, the government must produce evidence that "social, political or economic considerations entered into the timing of the clearance interval at Wisconsin and Fessenden." Aguehounde further argues that "both common sense and expert testimony ... dictate that once a decision is made to have a clearance interval ... the interval must be set long enough to allow traffic to clear the intersection."

If we were to accept Aguehounde's argument, the District would be required to justify the policy underlying each of the myriad decisions involved in traffic design. Our case law suggests, however, that the proper inquiry is not: what concerns were actually balanced in each individual act? Instead, we

---

**10.** Jurisdictions which have directly addressed the issue of whether the setting of a traffic light clearance interval is a discretionary function have gone both ways, with the view we adopt being in a slight majority. *Compare Davis v. City of Cleveland*, 709 S.W.2d 613, 615 (Tenn.App. 1986) (timing sequence for traffic light interval is a discretionary act); *Bjorkquist v. City of Robbinsdale*, 352 N.W.2d 817, 818 (Minn.App.1984) (same); *Weiss v. Fote*, 7 N.Y.2d 579, 200 N.Y.S.2d 409, 167 N.E.2d 63, 65 (1960) (same) *with, Delosovic v. City of New York*, 143 Misc.2d 801, 541 N.Y.S.2d 685, 688 (N.Y.1989) (government liable for inadequate walking period for "walk" "don't walk" signals); *Fraley v. City of Flint*, 54 Mich.App. 570, 221 N.W.2d 394, 397 (1974) (municipality liable for improper timing of traffic light interval).

should ascertain whether the type of function at question is grounded in policy analysis. *See, e.g., United States v. Gaubert,* 499 U.S. 315, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991). ("Discretionary conduct is not confined to the policy or planning level ... but on the nature of the actions taken and on whether they are susceptible to policy analysis"); *Baum v. United States,* 986 F.2d 716, 720–21 (4th Cir.1993) (court should examine whether "decision is one which we would expect inherently to be grounded in considerations of policy" and not conduct a "fact-based inquiry into the circumstances surrounding the government actor's exercise of a particular discretionary function"). Appellant's suggested approach of isolating each component of a decision is simply not required. *See Smith v. Johns–Manville Corp.,* 795 F.2d 301, 308 (3d Cir.1986) ("The position that agency decisions can be broken down into component parts is fundamentally at odds with the Court's teaching in *Dalehite.*"). Just as the length of yellow intervals is part of the overall traffic design, it is part of the overall policy of determining traffic flow in the District. *See Daigle, supra,* 972 F.2d at 1542 ("[a] decision that is a component of an overall policy decision protected by the discretionary function exception also is protected by this exception").[11]

In support of his contention that the government must establish that setting traffic intervals involved policy considerations, appellant relies on *WMATA v. O'Neill,* 633 A.2d 834 (D.C.1993). That reliance is misplaced. In *O'Neill,* the court held that a bus driver's inaction in dealing with disruptive passengers was not discretionary because there was an established policy in place indicating the safety rules the driver was to follow in such situations. *O'Neill,* 633 A.2d at 839. We held that WMATA was not immune from suit grounded in the alleged negligence of the driver in carrying out specific directives. *Id.* Aguehounde correctly reasons that this holding means that the District would not be shielded from liability for the negligence of an employee who fails to follow a set policy.

Appellant misreads *O'Neill,* however, when he contends that it stands for the proposition that there must be evidence of policy considerations in the employee's decision-making before immunity attaches. *O'Neill* does no more than hold that the District would be liable where an employee fails to follow an established policy, because the existence of a set policy means all discretion has been removed from the employee, and the employee's actions would thus be ministerial. *O'Neill* does not hold, nor suggest, that the government must prove the specific policy considerations behind each aspect of a given action. Consequently, *O'Neill* does not advance Aguehounde's contention that, because setting traffic intervals may involve engineering calculations requiring professional expertise, the District is required to prove the policy considerations behind the timing decisions to establish that the action is discretionary.[12]

---

11. The trial court recognized that, in the federal courts, the general rule is that the plaintiff bears the burden of demonstrating that subject matter jurisdiction exists, *Georgiades v. Martin–Trigona,* 234 U.S.App.D.C. 345 n. 4, 729 F.2d 831, 833 n. 4 (1984), although under the Federal Tort Claims Act, courts have held that the government has the burden of proving its actions fall within the discretionary function exception. *See Prescott v. United States,* 973 F.2d 696, 701–02 (9th Cir.). We agree with the trial court however, that, in this case, it is unnecessary to determine whether the burden of proof lies with the District to prove the existence of policy considerations in the timing decision, or on Aguehounde to show the decision is excepted from the general rule of immunity by proving it is a ministerial function, because, as the trial court concluded, it was clearly established that setting yellow intervals, a part of the overall traffic design, is a discretionary function.

12. Aguehounde also urges this court to follow the decision of the United States Court of Appeals for the District of Columbia Circuit in *Cope v. Scott,* 310 U.S.App.D.C. 144, 45 F.3d 445 (1995), which held "any discretion exercised by the government with respect to where and how to post signs warning of dangerous road conditions d[oes] not implicate 'political, social, or economic' policy choices of the sort that Congress intended to protect [by granting immunity]." The court in *Cope* determined that while the decision where to place "slippery when wet" signs involves some policy analysis, it is not the type of function "grounded in the policy of the regulatory regime" and is thus a ministerial and not discretionary function. *Id.* 45 F.3d at 449. *Cope* provides no authoritative support in light of the

### B. Did the District Adopt a Specific Directive Mandating the Setting of Traffic Intervals?

Finding that the setting of yellow intervals is a discretionary function does not end our inquiry. We now must determine whether there were any specific directives withdrawing from employees the option of exercising choice, which would transform the setting of the interval timing from a discretionary to a ministerial task. *McKethean*, 588 A.2d at 715; *Berkovitz*, supra, 486 U.S. at 536, 108 S.Ct. at 1958 ("the discretionary function exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow"). In the instant case no statute or regulation exists prescribing what clearance interval the Signal Design Branch of the District of Columbia Department of Transportation must set for the intersection. The only possible "directive" is the chart labelled "Required Yellow Interval in Seconds" ("chart"), and we must therefore determine whether that chart constitutes a "specific mandatory directive" for employees to follow in setting the interval timing which would render implementation by employees ministerial.

Aguehounde contends that the chart removed all room for the exercise of a policy judgment by mandating a particular formula that the engineers must use to set clearance intervals at intersections. In support of this argument, Aguehounde relies on the District's answer to Interrogatory No. 1[13] and the word "required" in the title of the chart as evidence that "the District had adopted a policy of following the national formula." Alternatively, appellant argues that even if the evidence did not prove the District had adopted the national timing formula, the interrogatory answers proved that it did so at the intersection in question and mis-measured the width, which was "an indisputably ministerial act." We conclude that the evidence considered as a whole did not establish the existence of a mandatory policy for setting traffic intervals which would transform the function into a ministerial one. We also conclude that any mis-measurement, if there was one, was therefore irrelevant in this analysis.

holding in *Urow v. District of Columbia*, decided by the same U.S. Court of Appeals in 1963, which is binding on us, *see M.A.P. v. Ryan*, 285 A.2d 310 (D.C.1971), and to the extent relevant, apparently on the *Cope* court as well. *See United States v. Doe*, 235 U.S.App.D.C. 99, 101 n. 2, 730 F.2d 1529, 1531 n. 2 (decision of previous panel may be overruled only by the en banc court, not another panel). The *Urow* court held that the establishment of a general traffic control plan is the result of an exercise of discretion, immune from liability, and that the decision whether to provide a traffic control device at a particular intersection is part of that overall policy decision. Therefore, the District was immune from liability flowing from its failure to locate a traffic control device at what was concededly a very dangerous intersection. Consequently, we conclude that *Urow*, not *Cope*, controls our analysis relating to the timing of the interval of a traffic control device. The court in *Cope*, which was decided under the Federal Tort Claims Act, made no reference to *Urow*.

13. Interrogatory question No. 1 and the District's answer are as follows:

1. Please specify what criteria was used to determine the yellow interval time and the red-red (all red) interval time in effect on 4-23-91, on all intersections controlled by traffic control devices on Wisconsin Avenue between Western

Avenue and Calvert Street, N.W. Please state the specific formula used to establish such time intervals.

ANSWER: $Y = T + 1/2 \dfrac{V}{A} + \dfrac{(W + L)}{V}$

This interrogatory answer was not introduced at trial and the District therefore claims that Aguehounde cannot rely on its contents to support his contention that the District required use of this formula. In deciding the discretionary function issue, the trial judge expressed doubt that "the plaintiff may ... properly rely on matters outside the trial record to support his position." Nonetheless, as we discussed in the text, *supra* at 11, the trial judge may properly consider evidence not heard by the jury in making the determination of jurisdictional facts. *Matthews*, 558 A.2d at 1179. Therefore, the trial court correctly "assum[ed] that the evidence can be used," and considered the answer to Interrogatory No. 1, in making its finding that no specific directive existed for setting light intervals.

Moreover, the question whether Aguehounde can rely on Interrogatory No. 1 to support his contention is essentially moot because we conclude, as did the trial judge, that the fact that the responsible District employee *used* a particularly formula (*i.e.:* that contained in Interrogatory No. 1) does not establish that the District *required* its employees to use that formula.

Our review of the evidence confirms the trial judge's findings that there was no policy or specific directive mandating that District engineers follow the formula contained in the chart. On this point the trial judge found there was no evidence "that the chart was issued as part of any memorandum or other writing directing that traffic engineers use it.... Nor is there evidence of any oral communication requiring its use." Indeed, the testimony of the chief engineer established that there was no written policy requiring use of the chart and that an engineer uses that formula "because he feels that it is the chart he should use." The trial judge credited this assertion of the chief engineer and placed great reliance upon it, noting that the fact that an engineer uses the chart not out of obligation, but because he "feels he should," is not sufficient, without more, to establish that the District mandated its use. Because we conclude that the trial judge was not clearly erroneous in crediting the engineer's testimony, we defer to his findings of fact. *See, e.g., Alexander, supra,* 428 A.2d at 50; *In re Baby Boy C, supra,* 630 A.2d at 683.

Moreover, the testimony at trial established that there were several different charts which the engineers used to determine the length of signal intervals.[14] The trial judge's findings of fact, which have ample support in the record, confirms that several formulas were available for the District engineers to choose from in setting light intervals, and that there was no directive of any kind requiring an engineer to use the chart. In sum, the evidence supports the trial court's finding that there had been no showing that the District had adopted the formula in the chart as a mandatory directive.

Nonetheless, Aguehounde argues that "the very [use of the] "required" language in the chart's title amply proved th[e] point" that the chart was a required directive. The evidence is to the contrary, and as the trial court found, without more, "the word required ... does not itself establish a specific directive that the Signal Design Branch change the interval at Fessenden and Wisconsin...."

Appellant's alternative argument that Interrogatory No. 1, *see supra* note 13, establishes a mandatory policy for setting the signal intervals must also be rejected. The interrogatory answer does not establish that the District had adopted a mandatory directive to use the formula. At most, the response shows that an engineer used a specific formula in setting the interval at the intersection in question. It does not establish that the District required him to do so.

Finally, Aguehounde contends that the engineer's mis-measurement of the width of the intersection is a ministerial act for which the District can be liable if the asserted mis-measurement can be linked to the injury. Aguehounde claims the District failed to include both crosswalks in its measurement which resulted in a calculation of 65 feet for the width of the intersection. At trial, Aguehounde's traffic engineering expert, Sheldon Pivnik, testified that the width of the intersection, "W", in the clearance interval formula used by the District (*see* discussion, *supra* at 446–447), must be determined by measuring from the stop line beyond the crosswalk at one side of the intersection to the corresponding stop line at the other side of the intersection. Using that definition of "W", the width of Wisconsin avenue is 106 feet. Thus argues Aguehounde, because the clearance interval was originally set at 4.5 seconds at the Fessenden/Wisconsin intersection, the District must have mis-measured the width since a "W" value of 65 feet, rather than the

14. Aguehounde argues that the trial court could not consider this testimony because it was struck by the court during trial. In fact, as the District points out, the trial judge only struck the portion of the engineer's testimony setting out the specific charts or formulae the previous District engineer had used in setting the interval; "[w]hat was stricken was his report about what the other engineer had done before this time." The engineer's testimony regarding the existence and use of several other charts, however, was not stricken from the record. Moreover, the trial court specifically noted that while the engineer may "not have been able competently to state what was in the [previous] engineer's mind when he made the decision, he was competent to state that other charts were in use." Finally, even if evidence of other charts was not admissable for consideration by the jury, the trial court, as factfinder on the discretionary/ministerial function issue could, as we said above, properly consider it.

correct 106 feet, would result in an interval of 4.5 seconds.

The government maintains, however, that using 65 feet as the "W" in the formula results in an interval of 4.9 seconds rather than 4.5 seconds.[15] Therefore, it contends the 4.5 second interval could not have resulted from the claimed faulty mis-measurement. Furthermore, the District could have, in the exercise of its discretion, in order to minimize traffic delays, set the interval to accommodate motorists rather than pedestrians. That would be the result with a 4.0 or even a 4.5 second clearance interval.

Finally, with respect to the so-called mismeasurement, our dissenting colleague reads far more into the testimony of Saraj Gyani, a District traffic engineer, than the trial judge did or we do. Judge Schwelb asserts that the witness "effectively admitted ... that ... it was a faulty measurement of the intersection, rather than a high-level choice between policies, that led to ... an erroneous ... clearance interval...." That assessment significantly overstates what the witness said. Gyani was presented with an exhibit[16] that reflected the results of the calculation of the interval timing, apparently pursuant to the formula found in the "Required Yellow Interval in Seconds" chart discussed *supra* at 446; 451, for various clearance distances expressed in feet.

We think Gyani's testimony, given in response to a series of leading questions, can fairly be summarized as follows:

If that formula is followed, and if it is intended to set the interval to ensure that the pedestrian crosswalks are cleared, the width used should be as measured from the outer limits of the crosswalk on one side of the street to the corresponding part of the crosswalk on the other side of the street which, in this case, is just over 105 feet, then the clearance interval, according to the exhibit would be 5.7 seconds.

The trial judge, who heard the witness's responses to counsel's questions, concluded, as we do, that the testimony was "intended to mean, if the chart were used, the calculations show that the interval should be six seconds." In short, although the numbers do not precisely jibe, that testimony does no more than confirm, the calculation by Aguehounde's expert Clyde Richard as set forth in note 5, *supra.* Gyani's testimony on this point does not advance Aguehounde's cause, however, because it in no way contradicts the testimony, credited by the trial court, that the formula was not mandated by the District or even used at that intersection. As we have said, because use of the formula was not mandated by the District, any error in applying it, if there was one, does not convert a discretionary act into a ministerial one.

The question of negligence has no relevance until it is established that an act was ministerial. *See McKethean, supra,* 588 A.2d at 715; *O'Neill, supra,* 633 A.2d at 837–38; *Johnson v. U.S. Dept. of Interior,* 949 F.2d 332, 340 (10th Cir.1991) ("[F]actual issues

15. The government did not explain its calculations resulting in a 4.9 second interval using a "W" of 65 feet. However, we have set forth in note 5, *supra,* the calculations by Aguehounde's expert which produce an interval of six seconds. If the same factors used by Aguehounde's expert were used with a "W" of 65 feet rather than the 106 feet, the result would be an interval of 2.1 seconds, rather than 3.2 seconds (using 106 feet), in the third part of the standard formula. That duration, when added to the 1 second for part one of the formula, and the 1.8 seconds for part two, results in a total duration of 4.9 seconds as the District claims.

16. This exhibit appeared as follows:

REQUIRED YELLOW INTERVAL
(Approach Speed 25 MPH)

| Clearance Distance (feet) | Required Interval (seconds) |
|---|---|
| 30 | 3.6 |
| 35 | 3.7 |
| 40 | 3.9 |
| 45 | 4.0 |
| 50 | 4.2 |
| 55 | 4.3 |
| 60 | 4.4 |
| 65 | 4.6 |
| 70 | 4.7 |
| 75 | 4.8 |
| 80 | 5.0 |
| 85 | 5.1 |
| 90 | 5.2 |
| 95 | 5.4 |
| 100 | 5.5 |
| 105 | 5.7 |
| 110 | 5.8 |
| 115 | 5.9 |
| 120 | 6.1 |

concerning negligence are irrelevant to the threshold issue whether the officials' actions are shielded from liability by the discretionary function exception") (citation omitted). Consequently, Aguehounde's argument that the District mis-measured the width of the intersection does not assist us with the determination of whether the clearance interval was a discretionary or ministerial function. If we had first found that setting intervals was ministerial, then consideration of the alleged mis-measurement might be probative of the negligence of the District's employees in performing this ministerial act. *See Cope v. Scott,* 310 U.S.App.D.C. at 147, 45 F.3d at 448. ("*If* a specific directive exists ... [t]he only issue is whether the employee followed the directive") (emphasis added). Because we have determined that setting the intervals is a discretionary act, however, and because the District did not mandate the use of the formula in question, any alleged mis-measurement of the intersection is immaterial, because the District is not liable for negligently performed discretionary acts.

In sum, because the record supports the finding that the District had no mandatory policy in place for determining signal intervals, the trial court properly could find, as it did, that the District used the formula in the chart as a guide, therefore making its use a discretionary function.

No. 93–CV–1116 *Affirmed.*

No. 93–CV–1213 *Dismissed as Moot.*

SCHWELB, *Associate Judge,* dissenting:

I am unable to agree with my colleagues that the District's actions in this unfortunate case are protected by the doctrine of sovereign immunity. Accordingly, I respectfully dissent.

## I. GENERAL LEGAL PRINCIPLES

### A. *Burden of Proof.*

Before discussing the evidence of record, I think it useful to state my understanding of the applicable legal principles. I begin with an issue which the trial judge found it unnecessary to decide, namely, the proper assignment of the burden of proof.

It is, I think, undisputed that the District is the only party which had unrestricted access to all of the information relevant to its claim of immunity. What the District's employees did, why they did it, and what factors they considered, are facts readily known only to the District. "[I]t has been established as a general rule that the burden of proof lies on the person who wishes to support his case by a fact which lies peculiarly within his knowledge, or of which he is supposed to be cognizant." *Selma, R & D.R. Co. v. United States,* 139 U.S. 560, 568, 11 S.Ct. 638, 640, 35 L.Ed. 266 (1891) (citations omitted); *see also ITSI TV Productions, Inc. v. Agricultural Ass'n.* 3 F.3d 1289, 1292 (9th Cir.1993). "The ordinary rule, based on considerations of fairness, does not place the burden upon a litigant of establishing facts peculiarly within the knowledge of his adversary." *Browzin v. Catholic University of America,* 174 U.S.App.D.C. 60, 66 n. 12, 527 F.2d 843, 849 n. 12 (1975) (quoting *United States v. New York N.H. & H.R. Co.,* 355 U.S. 253, 256 n. 5, 78 S.Ct. 212, 214–15 n. 5, 2 L.Ed.2d 247 (1957)).[1]

Applying this principle to a governmental claim of immunity, the Supreme Court of Michigan has explained that

> whether a governmental agency was engaged in a governmental function when performing the act complained of is a question best known to the agency and best asserted by it. It naturally follows that plaintiffs need not plead facts in avoidance of immunity, but that it is incumbent on the agency to assert its immunity as an affirmative defense.

*McCummings v. Hurley Medical Center,* 433 Mich. 404, 446 N.W.2d 114, 117 (1989) (per

---

1. There are obvious limits to the applicability of this rule, especially in light of the availability of modern pretrial discovery. *See* EDWARD W. CLEARY, MCCORMICK ON EVIDENCE, § 337, at 950 & n. 11 (1984). Nevertheless, it appears to me unreasonable in the present context to require Aguehounde to prove the circumstances under which a decision was made within the District government, or the basis on which District employees made such a decision. *Cf. Stewart v. United States,* 199 F.2d 517, 520 (7th Cir.1952), in which the court concluded, using some strong language, that it would be altogether inappropriate to place such a burden on the plaintiff.

curiam). The Supreme Court of New Jersey has held that the burden is on the public entity both to plead and prove its immunity. *Kolitch v. Lindedahl*, 100 N.J. 485, 497 A.2d 183, 189 (1985) (construing New Jersey statute). The federal appellate courts which have considered the question have unanimously concluded that when the "discretionary function" exception to the Federal Tort Claims Act is invoked as a defense against a facially sufficient complaint, the United States bears the burden of proving that the particular governmental action falls within the scope of that exception. *See Prescott v. United States*, 973 F.2d 696, 701–02 (9th Cir.1992) (citing authorities). "If the government desires to rely upon any of [the] provisions [exempting it from liability for the exercise of a discretionary function], it has a right to do so in defense of the action, providing such defense is aptly pleaded *and proven.*" *Stewart, supra* note 1, 199 F.2d at 520 (emphasis added).[2]

"In selecting and adopting a general plan of public improvement ... the municipal corporation exercises judicial discretion, but in carrying out the plan it acts ministerially, and must perform the work in a reasonably safe and skillful manner." *District of Columbia v. Caton*, 48 App.D.C. 96, 104–05 (1918); *see also Elgin v. District of Columbia*, 119 U.S.App.D.C. 116, 118–19, 337 F.2d 152, 154–55 (1964). The dispositive question is whether the District proved by a preponderance of the evidence that the acts and decisions of which Aguehounde complains were discretionary rather than ministerial.

### B. Discretionary and Ministerial Functions.

The majority has outlined in some detail the distinction between discretionary and ministerial governmental functions. I have no quarrel with much of its discussion. I cannot agree, however, that because the determination of the duration of the clearance interval at Wisconsin and Fessenden was a *de facto* part of the District's overall traffic

plan, the decision to set it at four seconds was necessarily a protected discretionary act. In my opinion, this proposition, followed to its logical conclusion, would insulate the District from liability for negligent conduct under circumstances which the discretionary function doctrine was never designed to reach.

As Judge (later Attorney General) Griffin Bell wrote for the court in *Fowler v. Southern Bell Telephone & Telegraph Co.*, 343 F.2d 150 (5th Cir.1965), "the defense of sovereign privilege imposes a drastic impingement on personal liberty, and is recognized only because the impingement is considered justified in order to encourage public officials to fearlessly discharge the duties of their office." *Id.* at 154. Not every governmental decision which involves some exercise of discretion is insulated from review, for "it would be difficult to conceive of any official act, no matter how directly ministerial, that did not admit of some discretion in the manner of its performance, even if it involved only the driving of a nail." 18 Eugene McQuillin, The Law of Municipal Corporations, § 53.04.10, at 157 (3d ed.1993) (quoting *Ham v. Los Angeles*, 46 Cal.App. 148, 189 P. 462, 465 (1920)).

The goal of the discretionary function exception is to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic and political policy through the medium of an action in tort." *United States v. Varig Airlines*, 467 U.S. 797, 814, 104 S.Ct. 2755, 2764–65, 81 L.Ed.2d 660 (1984). "The discretionary function exception applies only to conduct that involves the permissible exercise of policy judgments." *Berkovitz v. United States*, 486 U.S. 531, 537, 108 S.Ct. 1954, 1959, 100 L.Ed.2d 531 (1988). Accordingly, when that exception is invoked, the court must make "a particularized and fact-specific inquiry to determine whether the acts or omissions in question flowed from a choice based on economic or social policy." *Prescott, supra*, 973

---

**2.** In *District of Columbia v. Banks*, 646 A.2d 972 (D.C.1994), this court held that "governmental immunity must be affirmatively asserted in the defendant's pleadings." *Id.* at 979 n. 9. Although the question of the burden of proof as to

sovereign immunity was not presented in *Banks*, our treatment of the District's claim of immunity as analogous to an affirmative defense leads logically to the conclusion that the District must carry that burden.

F.2d at 700. That inquiry is designed to determine not whether the government employee has a choice, but whether that choice is a policy judgment. *Id.* (citations omitted).

Moreover, there is persuasive authority for the proposition that governmental conduct is insulated from liability only "where the official or employee *actually* exercised some discretion." 18 McQUILLIN, *supra,* § 53.04.10, at 157 (emphasis added).

> Immunity for "discretionary" activities serves no purpose except to assure that courts refuse to pass judgment on policy decisions in the province of coordinate branches of government. Accordingly, to be entitled to immunity *the state must make a showing that such a policy decision, consciously balancing risks and advantages, took place.* The fact that an employee normally engages in "discretionary activity" is irrelevant if, in a given case, the employee did not render a considered decision.

*Johnson v. State,* 69 Cal.2d 782, 73 Cal.Rptr. 240, 249 n. 8, 447 P.2d 352, 361 n. 8 (1968) (emphasis added); 18 McQUILLIN, *supra,* § 53.04.10 at 160 n. 7.[3] Although some decisions reflect a different focus,[4] proof that an administrative decision was not based on economic or social considerations is surely probative on the question whether the "discretionary function" exception applies, especially where, as in this case, the testimony of the District's own representatives, described *infra* at pp. 458–459, demonstrates that the failure to weigh such factors was the norm rather than the exception.

There is no dispositive District of Columbia precedent on the precise question presented to us, but I believe that the approach of the courts in this jurisdiction has been generally consistent with the authorities which I have cited. It has long been established that the District has a ministerial duty to maintain the streets in a reasonably safe condition for travel, and that this is an exception to the doctrine of sovereign immunity. *Wagshal v. District of Columbia,* 216 A.2d 172, 173 (D.C.1966); *see also District of Columbia v. Pace,* 498 A.2d 226, 230 (D.C.1985). In *Wagshal,* this court, citing *Urow v. District of Columbia,* 114 U.S.App.D.C. 350, 316 F.2d 351 (1962) (per curiam), *cert. denied,* 375 U.S. 826, 84 S.Ct. 69, 11 L.Ed.2d 59 (1963), recognized that the District's determination whether or not to place a traffic light at a particular intersection was discretionary and protected by sovereign immunity. *Wagshal,* 216 A.2d at 173. We held, however, that there can be no immunity "if the plan that is adopted creates a hazard on the road, either because of its inherent unreasonableness *or because of negligence in its administration.*" *Id.* at 173–74 (emphasis added). More recently, we observed that "[t]he fact that in a particular case an [employee] might have alternative courses of action from which to choose, and this choice might involve a certain degree of judgment, does not elevate the [employee's] decision to the level of 'basic policy.'" *WMATA v. O'Neill,* 633 A.2d 834, 839 (D.C.1993) (quoting *Lopez v. Southern California Rapid Transit,* 40 Cal.3d 780, 221 Cal.Rptr. 840, 849, 710 P.2d 907, 916 (1985)).

Only a few months ago, in *Cope v. Scott,* 310 U.S.App.D.C. 144, 45 F.3d 445 (1995), the United States Court of Appeals unanimously held that the decision where to place "slippery when wet" signs in Rock Creek Park was not "grounded in the policy of the regulatory regime" and did not implicate "political, social, or economic policy choices of the

---

**3.** The decision of the Supreme Court of California in *Johnson* and the views of the leading commentator on the law of municipal corporations cannot accurately be characterized as "no support." *Cf.* Op. at 449. No reasonable person can quarrel with the truism, relied on by the majority, that "where there is room for policy judgment and decision, there is discretion." *Id.* at 449 (quoting *Dalehite v. United States,* 346 U.S. 15, 36, 73 S.Ct. 956, 968, 97 L.Ed. 1427 (1953)). This proposition, however, does not negate the Supreme Court's explanation that "discretionary function" exception was designed to insulate from judicial second-guessing "decisions *grounded in* social and economic policy." *Varig Airlines, supra,* 467 U.S. at 814, 104 S.Ct. at 2764 (emphasis added).

**4.** *See, e.g., Crumpton v. Stone,* 313 U.S.App.D.C. 412, ——, 59 F.3d 1400, 1403 (1995) ("we look not to what the decision-maker in a particular case was thinking, but to whether the type of decision being challenged implicates policy judgments") (citation and internal quotation marks omitted).

sort that Congress intended to protect [by granting immunity.]" *Id.* at ——, 45 F.3d at 452. The court rejected the government's contention that the balancing of safety considerations against the aesthetic appearance of Beach Drive represented a protected discretionary function. My colleagues contend that *Cope* was erroneously decided,[5] and that *Urow,* not *Cope,* controls. The 2:1 decision in *Urow* is, however, distinguishable in a decisive respect. See note 12, *infra,* and preceding text. Moreover, although *Cope* is not binding on us, we ought at least to pause before we reject a very recent decision of our federal appellate colleagues across the street and place the contemporary law of sovereign immunity in the District of Columbia in unnecessary disarray. *See Hornstein v. Barry,* 560 A.2d 530, 536–37 n. 15 (D.C.1989) (en banc).[6]

## II. SETTING THE CLEARANCE INTERVAL—A DISCRETIONARY FUNCTION?

The trial judge found it to be "clear" that setting traffic signal intervals "is the type of function that the discretionary function rule is designed to shield." This is so, according to the judge, because the timing of the light

involves considerations of safety not only for pedestrians but for travellers, and it involves a balancing of safety needs against the need to assure adequate traffic flow, which itself involves considerations of safety as well as commerce and convenience. Balancing these facts also requires the ascertainment of facts, such as numbers of vehicles and pedestrians, and

ways in which drivers and pedestrians behave in the aggregate, which are peculiarly subject to study and expertise. Subjecting the decisions of traffic engineers to litigation and to second-guessing by jurors would deter effective government. For these and other reasons, our courts have held that with respect to functions like the one here, the function is discretionary.[7]

My colleagues "fully agree" with this analysis, but I do not believe that the record bears it out.

### A. The State of the Record.

I think it important to note at the outset that we are not dealing here with the question whether to install a traffic signal at the intersection of Wisconsin Avenue and Fessenden Street. *Cf. Urow, supra.* The decision to place a signal at that location had been made many years before. The determination by the District's engineers which is challenged on this appeal concerns solely the length in seconds of the "clearance interval;" *i.e.,* how much time vehicular traffic should be given to clear the intersection before pedestrians and drivers are given a green light to cross the street.

According to Aguehounde, there is no support in the record for the trial judge's assertion that this narrow question required the District's engineers to balance pedestrian safety against traffic flow, commerce, or convenience, or to include in their calculus the various other considerations enumerated by the trial judge in the passage from his opinion which I have quoted. The District does not really challenge Aguehounde's reading of

5. The majority also points out that *Cope* was decided under the Federal Tort Claims Act. This court's decision to adopt "the distinction between discretionary and ministerial decisions was [, however,] influenced by similar distinctions drawn under the [FTCA]." *District of Columbia v. North Wash. Neighbors, Inc.,* 367 A.2d 143, 148 n. 7 (D.C.1976), *cert. denied,* 434 U.S. 823, 98 S.Ct. 68, 54 L.Ed.2d 80 (1977); *see also Spencer v. General Hospital of the District of Columbia,* 138 U.S.App.D.C. 48, 53, 425 F.2d 479, 484 (1969) (en banc). Accordingly, I do not think that *Cope* can be persuasively distinguished on that ground.

6. Oddly, the court in *Cope* did not mention *Urow. Cf. United States v. Doe,* 235 U.S.App.D.C. 99,

101 n. 2, 730 F.2d 1529, 1531 n. 2 (1984) (one panel of United States Court of Appeals lacks the authority to overrule decision of a previous panel; only the full court, sitting en banc, may do so).

7. The judge cited *Urow, supra,* 114 U.S.App.D.C. at 352, 316 F.2d at 353; *North Wash. Neighbors, Inc., supra,* 367 A.2d at 148 n. 7; *District of Columbia v. Pace, supra,* 498 A.2d at 229; and *McKethean v. WMATA,* 588 A.2d 708, 715 (D.C. 1991) as involving "functions like the one here." I address these decisions in note 12, *infra.* The judge also relied on three decisions from other jurisdictions specifically involving traffic signal intervals. I discuss these cases in note 13, *infra.*

the record,[8] and my own search has revealed nothing to suggest that Aguehounde is mistaken. Indeed, the testimony of Aguehounde's expert witness reveals, and the District's "Required Yellow Interval in Seconds" chart[9] confirms, that the length of the clearance interval is set—and is supposed to be set—on the basis of a three-part formula which does not include the factors to which the judge referred.

Moreover, the testimony of the District's own witnesses reflects that social, economic and political factors were probably not considered at all when the decision in question was made. In most instances, according to the District's expert, a four-second interval is selected almost automatically as suitable for any intersection. Finally, a traffic engineer who was the principal witness for the District effectively admitted in testimony which I quote in note 10, *infra*, that on this particular occasion, it was a faulty measurement of the intersection, rather than a high-level choice between policies, that led to what proved to be an erroneous decision as to how long the clearance interval should be.

Aguehounde called two expert witnesses, Richard Pivnik, a traffic engineer, and Clyde Richard, an expert on accident reconstruction. Pivnik testified that the correct clearance interval is determined by a formula based on the "perception reaction time," the "accepted deceleration rate for a controlled comfortable stop," and the "time it would take a car to clear the intersection." The third of these factors obviously depends on the width of the intersection. Pivnik believed that this formula—which the District applied in its "Required Yellow Interval in Seconds" chart—was in use in "every jurisdiction . . . that I know of, that I'm familiar with," and that it had been an accepted formula for at least thirty years. Pivnik did not include in the calculus the other consider-

ations enumerated by the trial judge, such as "balancing of safety needs against the need to assure adequate traffic flow," and it is readily apparent from his testimony that these factors are not a part of the formula, and that they therefore play no role in this particular decision. The testimony of Clyde Richard, an accident reconstruction expert, was essentially identical to that of Mr. Pivnik with respect to the manner by which the formula is calculated.

Raj Ghaman, the District's traffic engineering expert, testified that "there are various tests that suggest and are commanded that clearances—signal clearances—be between three and six seconds." He stated that "[al]most everybody, and I included, have used about four seconds as a magic number that works at just about every intersection." Ghaman did not contradict the testimony of Pivnik and Richard as to the factors which go into the "clearance interval" calculus. Moreover, his testimony indicates that, far from weighing competing policy considerations applicable at the particular intersection, District of Columbia engineers routinely set the interval at four seconds at virtually all intersections.

Saraj Gyani, a traffic engineer who was the District's principal witness, testified primarily that he was unaware of any statute, regulation or policy that required a six-second interval at the Fessenden traffic light. He also expressed the opinion that four seconds was a safe interval. Gyani did not, however, contradict the evidence presented by Aguehounde as to the factors which engineers consider in setting the clearance interval. Indeed, his testimony does not suggest that the clearance interval is set at any given intersection, or was set at four seconds in this case, on the basis of a choice between policy alternatives.[10]

---

8. The District claims in its brief that a decision with respect to the clearance interval at a particular intersection
    does not simply affect that intersection. It affects the flow of traffic on the entire street and hence, affects the larger system-wide traffic control structure, which is clearly entitled to discretionary immunity.
  It is revealing that the District has no citation to the record following this assertion.

9. See Op. at 446.

10. Specifically, as I read the record, Gyani acknowledged that in calculating the width of the intersection for the purpose of identifying "the time it would take a car to clear the intersection," the District measured the wrong distance. In its answer to an interrogatory, the District had represented that the width of the intersection

Like most judges, I am no expert on traffic engineering. There may perhaps appear to be some intuitive merit in the trial judge's assessment of what factors engineers do or should consider in determining the duration of the clearance interval. But if the factors enumerated by the judge, or any of them, are a part of the prescribed or actual calculus, the District had ample opportunity to adduce evidence proving this to be the case. The District failed altogether to do so, however, and instead presented testimony that the interval was either arbitrarily fixed at four seconds as a matter of routine (according to Ghaman) or selected, in this case, as a result of a measuring error (according to Gyani).[11]

I do not think the trial court or this court can properly come to the District's rescue in light of this failure of proof, especially given what I view as the effective destruction of the District's "choice between policy alternatives" theory by its own witnesses. We have recognized that "where a fact is well known by all reasonably intelligent people in the community," courts may judicially notice that fact without requiring formal proof. *Poulnot v. District of Columbia*, 608 A.2d 134, 141 (D.C.1992) (citation omitted). Any connection, however, between the duration of the clearance interval at Wisconsin and Fessenden and the flow of traffic, both there and at other intersections, is not sufficiently well-known or obvious to permit a court to take judicial notice of it.

### B. The "Clearance Interval" Case Law.

Given the state of the record, the cases in this jurisdiction on which the judge relied are readily distinguishable. In each of them, the governmental decision in question was different from, and more traditionally discretionary than, the setting of the "clearance interval." Moreover, as I read these cases, none of them involved a situation in which the evidence showed that no "policy" discretion was exercised in fact.[12]

was taken curb to curb, a distance of 65 feet. Gyani, however, testified as follows:

Q. Backing up one second in terms of measuring the intersection, when we know the speed is 25 miles an hour, the way you were supposed to measure the width of the intersection to set the clearance interval as of April 1990—correct me if I'm wrong—was from the stop bar one side, across the first crosswalk, across the middle of the intersection, and then across the crosswalk on the other side; am I right?

A. You are right.

Q. ... And, the reason for that is that you need to measure the width of the intersection in order to have enough time for the cars, not just to clear the box in the middle, but also to clear the crosswalks where the pedestrians might be; correct?

A. Correct.

Q. ... And, this measurement here, 105 feet 9 inches, is an accurate measurement of stop bar to the far side of the far crosswalk on Wisconsin and Fessenden; correct?

A. I haven't measured it, but, yes, it sounds reasonable.

Q. ... So, what you should have had on this intersection as of April 23, 1990, is a clearance interval of at least 5.7, or rounded off, six seconds; correct?

A. Should have.

The District contends that this testimony was based on the unverified assumption that the formula in the District's chart was supposed to be applied. *My colleagues in the majority apparently agree.* See Op. at 453. The transcript reveals, however, that Gyani made his concession with-

out any qualification. No qualification was necessary, for Gyani testified that although the formula was not mandated, this chart was in use both at the time of his testimony and at the time the decision as to the clearance interval was made.

The reader should note that the indented lines on pp. 22 of the majority opinion, beginning with the words "If that formula is followed," are *not* a quotation from Gyani's testimony. Rather, they reflect the majority's conception of what Gyani meant. The actual testimony which Gyani gave is quoted in this footnote.

11. If the Districts engineers had been making a "policy" decision as between pedestrian safety and maintaining the flow of traffic, as the District suggests, then the clearance interval could have been varied according to traffic volume at different times of day in order to improve traffic flow. This was not done, however. In fact, Aguehounde's evidence showed that the proportion of red and green time for Fessenden Street and Wisconsin Avenue was set differently for "Off Peak," "A.M. Peak," and "P.M. Peak" times, but that the Fessenden Street yellow light remained constant at four seconds throughout the day.

12. In *Urow*, the court, with one judge dissenting, held that the decision whether to *install* a traffic light was discretionary where the applicable statute authorized that the commissioners to provide such traffic control devices "as are deemed advisable." 114 U.S.App.D.C. at 351–52, 316 F.2d at 352–53. In *North Wash. Neighbors, Inc.*, a

As my colleagues have pointed out, "jurisdictions which have directly addressed the issue ... whether the setting of a traffic light clearance interval is a discretionary function have gone both ways." Op. at 448, n. 9. In my judgment, however, the decisions which are said to support the District's position are readily distinguishable, or unpersuasive when compared to the dissents, or both.[13] The cases rejecting the "discretionary function" defense, on the other hand, appear to me to constitute well-considered, albeit non-binding, precedents.[14]

case involving the question whether homeowners in the District must bear the cost of repairing certain pipes, the question of sovereign immunity was not raised by the parties, and the court simply commented that "the designing of streets and the control of the flow of traffic over them [are] discretionary in nature." 367 A.2d at 148 n. 7. In *Pace, supra*, we held that the planning of highways and the setting of priorities for their improvement were "policy determinations" which "call[ed] for a delicate balancing of competing considerations," and were thus discretionary. 498 A.2d at 228–29. In *McKethean v. WMATA*, 588 A.2d 708 (D.C.1991), we concluded that the failure to relocate a bus stop, like other aspects of the "design and planning of a transportation system," *id.* at 714, was a "quasi-legislative policy decision which [is] discretionary in nature and should not be second-guessed by a jury," *Id.* The court recognized in *McKethean*, however, that only a "policy decision" is discretionary, and that a decision implementing a policy is ministerial. *Id.* at 713.

Once a decision to place a traffic signal at an intersection has been made, the setting of a clearance interval could reasonably be viewed as ministerial implementation of that decision. In my view, the District failed altogether to prove that the clearance decision was not ministerial. In any event, none of the cases on which the trial judge relied decided that question.

**13.** The leading such case is *Weiss v. Fote*, 7 N.Y.2d 579, 200 N.Y.S.2d 409, 167 N.E.2d 63 (1960). In *Weiss*, the New York Court of Appeals, by a vote of 4:3, held that the setting of a four-second interval at a particular intersection by the City of Buffalo's Board of Safety was discretionary because the Board relied on extensive studies and because "there is nothing to suggest that its decision was either arbitrary or unreasonable." *Id.* 200 N.Y.S.2d at 413, 167 N.E.2d at 66. In the present case, on the other hand, Richard Pivnik testified that the setting of the light at four seconds was unreasonable because it invited pedestrians like Aguehounde to walk into the intersection, with the light in his favor, before the vehicular traffic had cleared. Moreover, Chief Judge Desmond wrote a compelling dissent in *Weiss*. He rejected the notion that "the timing of a single traffic light could be considered the kind of high-level policy decision not reviewable by the courts," and he complained that "[b]y this decision we are taking a long and surprising step backward into the old, abandoned area of governmental immunity." *Id.* 200 N.Y.S.2d at 416, 167 N.E.2d at 68.

In *Bjorkquist v. City of Robbinsdale*, 352 N.W.2d 817 (Minn.App.1984), the court held, relying on *Weiss, supra*, that the timing of a traffic signal is a discretionary duty because "[t]here is no obligation to time the lights a particular way," and because "that decision is arrived at after weighing competing interests." *Id.* at 819. In the present case, on the other hand, the testimony of Aguehounde's expert witnesses, which was bolstered by the District's witnesses, indicated that there was no such weighing here.

In *Davis v. City of Cleveland*, 709 S.W.2d 613 (Tenn.App.1986), a divided court held, by 2:1, that "the original setting of the yellow caution interval and any failure to reset such timing sequences in this instance represented a [discretionary] judgment call." *Id.* at 615. Judge Franks wrote a scholarly dissent which, in my view, is more persuasive than the majority opinion. After noting that "a wide array of 'operational' acts or decisions of public employees have been held 'non-discretionary' and therefore not exempt from tort liability," *id.* at 616, (citations omitted), Judge Franks wrote as follows:

The affidavit of appellant's expert witness advances the opinion that the 3.6 second interval was deficient under current standards, particularly in light of the traffic volume and approach speed at the intersection. The witness concluded "[t]he proper yellow time ... would have allowed the Jackson truck to clear the intersection before Mr. Davis was shown a green signal." Thus, a disputed issue of material fact as to whether the city or county, through its employees, acted negligently in setting the caution light interval under these conditions was established.

*Id.* at 617.

**14.** In *Delosovic v. City of New York*, 143 Misc.2d 801, 541 N.Y.S.2d 685 (Supreme Ct.N.Y. County 1989), a trial court decision, the judge addressed the common sense of a situation which was quite similar in principle to the present one:

Notwithstanding the fact that no case has been found discussing governmental liability relating to "Walk"—"Don't Walk" signals, and although such signals do not exist at all intersections where there are traffic lights, I find that *once these signals are installed there is a duty to pedestrians to see that they perform in a proper manner to inform pedestrians when it is appropriate to proceed*, and there may be governmental liability to a person injured by a vehicle if the timing is such that there is an inadequate period provided at any time the "Walk" signal appears for a person, proceeding at an average

### C. Other Considerations.

It is also worth noting that two Superior Court judges ruled, at earlier stages of this litigation, that the timing of the clearance interval was ministerial rather than discretionary in nature. In denying the District's motion for summary judgment, Judge Colleen Kollar–Kotelly held:

> [T]he plaintiff claims that the District failed to "execute" [its] own policy of using a set formula by improperly measuring the width of the road. Since the District does not have immunity for ministerial acts such as measuring distances and calculations after a policy is already determined, the District cannot claim immunity [as] to this basis for negligence.

Subsequently, at trial, Judge Burgess denied the District's motion for a directed verdict at the conclusion of Aguehounde's case because "the figure was too small" for the width of the intersection, resulting in a clearance time that was too short. Judge Burgess later reversed himself, however, and granted the District's motion for judgment n.o.v.

### III. CONCLUSION

Richard Pivnik testified on behalf of Aguehounde that by incorrectly measuring the intersection, and by setting the clearance internal on the basis of the erroneous measurement, the District's engineers made the light turn green before the cars had cleared the intersection. He stated that this prema-ture authorization to walk across the street created a danger which would not be readily apparent to a pedestrian.[15] If this testimony is credited, then employees of the District effectively (though inadvertently) lured Aguehounde into the accident by measuring the wrong distance.

I do not believe that such a measuring error is the kind of governmental action to which principles of sovereign immunity can fairly be held to apply. This is not a situation in which the jury is being asked to second-guess an authentic discretionary choice between policy alternatives. If the District had presented the testimony of the decision-maker to the effect that he weighed political, economic, or social considerations, or if it had adduced expert testimony showing that the setting of a clearance interval affects traffic at other intersections, that pedestrian safety was or should have been weighed against the movement of traffic, or that other recognized discretionary factors were or should have been considered, we would have a different case. In the case which we do have, however, I vote to reject the "discretionary function" defense.[16]

---

rate of speed, to complete the crossing before vehicular traffic is authorized to proceed. *Id.* 541 N.Y.S.2d at 688. (Emphasis added). I do find it odd, however, that the judge did not cite or consider the decision of his state's highest court in *Weiss v. Fote, supra.*

In *Fraley v. City of Flint*, 54 Mich.App. 570, 221 N.W.2d 394 (1974), the court squarely rejected the city's contention that "a municipality cannot, as a matter of law, be held liable in tort for the alleged improper timing of a traffic control signal." *Id.* 221 N.W.2d at 397. The court noted that Michigan law (like the District's) imposes a duty upon the government agency to maintain and design highways with reasonable care, and that the negligent setting of the interval, even within the range recommended by the Michigan Manual of Uniform Traffic Control Devices, was not shielded from liability. *Id.* 221 N.W.2d at 397.

15. Because my colleagues dispose of this case on the grounds of sovereign immunity, I do not reach the question whether Aguehounde was contributorily negligent as a matter of law. I wonder, however, whether judgment n.o.v. is appropriate when, if the evidence is viewed in the light most favorable to Aguehounde, the alleged contributory negligence was itself induced by the defendant.

16. Because I am of the opinion that, on this record, the setting of the clearance interval was a ministerial act rather than a discretionary one, I would not reach the question whether, assuming that such a decision is a discretionary one, it was rendered ministerial by the existence of a specific directive which left no room for an official to exercise a policy judgment. *See Berkovitz, supra,* 486 U.S. at 547, 108 S.Ct. at 1964. My colleagues do reach that question, however, and I feel constrained to express some reservations regarding their disposition of it.

Although there was plainly support in the record for the judge's finding that the formula in the

"Required Yellow Interval in Seconds" chart was not mandated, it is not at all clear to me that the same result would properly be reached if the District were assigned the burden of proof. Gyani testified that, although there was no written policy requiring the use of the chart, the person who sets the clearance interval uses the chart "because he feels that is the chart he *should* use." The word "required" speaks for itself.

Moreover, Mr. Moore, the engineer who set the clearance interval (and who is not otherwise identified in the record) was not called by the District to testify. "The production of weak evidence when strong is available can lead only to the conclusion that the strong would have been diverse." *Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 226, 59 S.Ct. 467, 474, 83 L.Ed. 610 (1939); *accord, Murphy v. McCloud*, 650 A.2d 202, 215 (D.C.1994). Although we do not know why Moore did not testify, the weakness of the evidence which the District did present leads me to question whether it can fairly be viewed as having met its burden of proof on the "specific directive" issue. I would be inclined to remand on that question with directions to the trial court to apply the correct burden of proof.